STATE of Utah, in the Interest of
M.L., a person under eighteen
years of age.

S.L., Appellant,

v.

STATE of Utah, Appellee.

No. 971342–CA.

Court of Appeals of Utah.

Aug. 13, 1998.

Grant W.P. Morrison and William P. Morrison, Morrison & Morrison, L.C., Salt Lake City, for Appellant.

Jan Graham, Atty. Gen., and Jeffrey Buckner, Asst. Atty. Gen., Salt Lake City, for Appellee.

Martha Pierce and Penny Heal Trask, Salt Lake City, Guardians Ad Litem.

Before DAVIS, P.J., GREENWOOD, and ORME, JJ.

## OPINION

GREENWOOD, Judge:

S.L. (Mother) appeals the termination of her parental rights in her son, M.L. We affirm.

## BACKGROUND [1]

Mother had four children, N.T., R.P., T.T. (now deceased), and M.L. The Division of Child and Family Services (DCFS) first became involved with Mother in 1992, when N.T., then fourteen years old, threatened to kill herself. DCFS prepared a treatment plan shortly thereafter geared toward providing treatment for N.T.

Later in 1992, DCFS intervened in connection with Mother's son, R.P., who was then about eleven years old. R.P. was apparently having difficulty with Mother's boyfriend, M.L., Sr. Between November 1992 and the end of 1994, DCFS prepared four different treatment plans in an attempt to allow R.P. to remain in Mother's home. Generally, these plans indicated that Mother would attend parenting classes when such classes were available. Mother took no action to comply with any of the four plans' recommendations. M.L. was born March 11, 1993.

Despite M.L., Sr.'s apparent physical abuse of R.P., Mother married M.L., Sr. on

---

1. " 'Because the termination of parental rights is fact sensitive, we review the facts of the controversy in detail.' " *State ex rel. J.P.,* 921 P.2d 1012, 1014 (Utah Ct.App.1996) (quoting *State ex rel. C.Y. v. Yates,* 765 P.2d 251, 252 (Utah Ct.App. 1988)), *cert. denied,* 931 P.2d 146 (Utah 1997).

February 1, 1994.[2] That same month, she requested a pickup on R.P. because he had run away.[3]

Mother was arrested on September 4, 1994 on drug charges. She was then placed on probation on September 22, 1994, and was arrested two days later, again on drug charges. On November 7, 1994, Mother was arrested on forgery and drug charges.[4] On November 28, 1994, Mother pleaded guilty to those charges and was incarcerated.

During the course of Mother's various arrests, Mother left T.T., who was then about three years old, and M.L., who was then about eighteen months old, in the care of her daughter, N.T., and a friend.[5] Mother had previously left the children with friends with whom she had used drugs in her home.

On November 15, 1994, after N.T. and the friend determined they could no longer care for the children, DCFS took T.T. and M.L. into protective custody. Mother agreed to place the children with her brother, B.T., and his wife, and the juvenile court allowed such placement with DCFS supervision. The court also ordered that Mother complete a psychological evaluation and a substance abuse treatment program.[6] The court allowed Mother visitation with the children, if possible, given her incarceration. In December 1994, Mother told her DCFS case worker that she would do whatever was necessary to get her children back, that she took responsibility for her actions, and that she was ready to change.

On March 9, 1995, and while in the custody of B.T. and his wife, T.T. died from a nonaccidental head injury.[7] After removing M.L. from B.T.'s home, and a second shelter hearing, DCFS was awarded temporary custody of M.L.

Mother remained incarcerated until May 1995, when she was released on probation to the House of Hope, a drug treatment facility. Although M.L. had previously been diagnosed with reactive attachment disorder and was awaiting placement at The Children's Center for treatment, DCFS changed that plan when arrangements were made for M.L. to enter the Mothers with Children program with Mother at the House of Hope on August 17, 1995. However, Mother tested positive for Valium on August 16, 1995. As a result, Mother was discharged from the House of Hope, her probation revoked, and she went to prison. Mother's drug use violated her most recent DCFS treatment plan and made fulfillment of most of its other requirements impossible.

After several review hearings, a twelve-month dispositional hearing was held March 6, 1996. Judge Robert Yeates ordered that DCFS extend reunification services to M.L.'s father, M.L., Sr., for an additional 120 days. At a July 8, 1996 hearing, the court ordered a trial home placement with M.L., Sr. and ordered that DCFS prepare a treatment plan to assist Mother after her upcoming release from prison. Mother was released from prison on July 31. On August 12, M.L., Sr. was arrested and incarcerated on drug charges, and M.L. was again returned to State custody. On August 13, DCFS determined that, "[b]ecause of [Mother's] past and the time limits of policy," a termination petition should be filed. DCFS believed "it would take probably six more months to a year of monitoring to ensure that [M.L.] would be safe, if placed with [Mother]." At a review hearing held September 23, 1996, the court

2. M.L., Sr. was incarcerated at the time.

3. R.P. has been in a proctor home since January 1997, by his own choice.

4. At trial, Mother testified she was also arrested on October 31, 1994.

5. At about this time, N.T. was institutionalized after a second suicide attempt. Although N.T. returned home for a time after that second treatment, she currently lives with her boyfriend.

6. At trial, Mother testified that she had completed a psychological evaluation while incarcerated at the Uintah County Jail in January or February 1995. She provided her DCFS case worker with a release to get the evaluation from Uintah Basin Counseling. When the case worker was unable to obtain a copy of the evaluation, she told Mother that DCFS would pay for another evaluation and gave Mother a referral to have a second evaluation completed. The case worker never received a copy of the evaluation.

7. B.T.'s wife was charged criminally for that death.

authorized a change in goals from home return to adoption, ordered an end to reunification services, and set a review hearing for November 25, 1996.

Mother filed a motion for trial home placement and the State filed a Verified Petition for Termination of Parental Rights. The court deferred ruling on Mother's motion pending the outcome of the termination trial and set trial for March 17, 1997. On February 28, 1997, Mother filed an Affidavit of Prejudice requesting that Judge Yeates recuse himself from presiding over the termination trial. Judge Yeates forwarded the affidavit to Judge Andrew Valdez, the presiding judge, who found the affidavit legally insufficient.

At the termination trial, Mother produced the following evidence in support of her present ability to care for M.L.: that, during her most recent period of incarceration, she completed all available parenting classes and maintained regular visitation with M.L.; that, as part of her parole, Mother completed a sixteen-week substance abuse mental health therapy class at Valley Mental Health in January 1997; that she has not used drugs for eighteen months; that she has lived with her mother and sister in Magna since being paroled; that she pays room and board to her mother, as well as monthly restitution payments in connection with her forgery convictions; that she has worked as a waitress at the same restaurant essentially since her release from prison; and that she has a positive relationship with her parole officer and is in compliance with her parole agreement.

However, while presenting this evidence, Mother also presented damaging evidence. Mother blamed R.P. for her problems with him and, despite evidence to the contrary, denied that M.L., Sr. had ever been physically abusive toward R.P.

Mother also defended her decision to leave her children with her older daughter, N.T., and known drug users, stating that she trusted such people "to take good care of the children." Furthermore, Mother testified that, although N.T. uses marijuana, Mother does not believe N.T. has a drug problem. As for her own addiction, Mother testified that the addiction is a disease that will remain with her always but stated she will not need to continue taking substance abuse classes and that support groups might be useful "here and there."

Mother also explained that, although DCFS has suggested she discontinue certain activities with M.L., she has rejected those suggestions because "I should be able to do what I want with my son." Although Mother admitted that she had needed help in parenting skills, she cited only her knowledge of CPR and "learning children have choices" as examples. When asked whether she thought there were other parenting issues as well, she stated, "I don't. I think that's good enough to say." Finally, Mother admitted that her brother, B.T., from whom she and her mother were currently renting a house, was threatening to evict her.

Mother's mother—with whom M.L. would be staying if Mother regained custody of him—testified that Mother had always been a good parent toward M.L. and that, although Mother had neglected R.P., M.L. "was never neglected before and he'll never be neglected again." There was also evidence presented that Mother's mother had seen bruises on both T.T. and M.L. while the children were in her son's custody but that, rather than investigate their source, she attributed them to the "normal" biting that occurs among children.

The State presented evidence that M.L., who is four years old, has lived with at least six different caretakers since his birth. Although he appears to want a relationship with Mother, M.L. becomes more clingy and irritable after Mother's visits and at times wets the bed. M.L. has calmed down significantly since first coming to the family with whom he now lives and is making progress in dealing with his reactive attachment disorder. Dr. Kristina Hindert, a psychiatrist at The Children's Center who is currently treating M.L., testified that, in her professional opinion, he needs permanency and stability.

On May 2, 1997, the juvenile court terminated Mother's parental rights in M.L. This appeal followed.

## ISSUES

Mother raises four issues on appeal. First, Mother contends that Judge Yeates should have recused himself because his presiding over prior proceedings involving M.L. could have biased him against Mother. Second, Mother argues that the juvenile court erred in failing to dismiss the State's case after the State's case-in-chief. Third, Mother argues that the juvenile court lacked sufficient evidence to terminate her parental rights in light of the evidence supporting her present ability as a parent. Finally, Mother asserts she is entitled to a new trial based on newly discovered evidence concerning her 1995 psychological evaluation results.

## ANALYSIS

### Recusal

■ Mother first argues that Judge Valdez erred in concluding her Affidavit of Prejudice was legally insufficient to support Judge Yeates's recusal from the termination proceeding. The question of whether a party's affidavit alleging judicial bias is legally sufficient is a question of law. *Cf. Alvarez v. Galetka,* 933 P.2d 987, 989 (Utah 1997) (describing issue in motion to dismiss for failure to state claim under Rule 12(b)(6) of Utah Rules of Civil Procedure "is whether the petitioner has alleged enough in the complaint to state a cause of action," which is question of law). Thus, we review Judge Valdez's determination for correctness. *See id.*

■ Rule 63(b) of the Utah Rules of Civil Procedure sets forth the procedure that parties and the court must follow when judicial bias is alleged. That rule requires the party asserting bias to file an affidavit that "shall state the facts and the reasons for the belief that such bias or prejudice exists." Utah R. Civ. P. 63(b). In deciding whether an affidavit is sufficient under the rule, we begin with the principle that "judges are presumed to be qualified." *In re Affidavit of Bias,* 947 P.2d 1152, 1153 (Utah 1997) (memorandum decision of Zimmerman, C.J., sit-

ting alone). Thus, Utah cases have consistently required that the bias alleged in the affidavit "have some basis in fact and be grounded on more than mere conjecture and speculation." *Madsen v. Prudential Fed. Sav. & Loan,* 767 P.2d 538, 544 n. 5 (Utah 1988) (citation omitted). Furthermore, such bias may not be based solely on the fact that the judge has issued prior rulings adverse to the party making the allegation. *See In re Affidavit of Bias,* 947 P.2d at 1154 (stating " 'no deduction of bias and prejudice may be made from adverse rulings by a judge.' " (quoting 46 Am.Jur.2d *Judges* § 219 (1994))); *Madsen,* 767 P.2d at 546 (stating " 'traditional judicial view is that if a judge can be disqualified for bias following a comment or ruling during the court proceedings, there is no limit to disqualification motions and there would be a return to "judge shopping." ' " (quoting L. Abramson, *Judicial Disqualification Under Canon 3C of the Code of Judicial Conduct* 23 (1986))).

■ Thus, to support a claim of bias based on a judge's presiding over prior proceedings, " 'it [must] appear[ ] that, apart from [the judge's] analysis of the issues of fact or law [in those prior proceedings], he had such a bias in favor of one party or prejudice against the other that he could not fairly and impartially determine the issues,' " *Poulsen v. Frear,* 946 P.2d 738, 742 (Utah Ct.App. 1997) (quoting *Orderville Irrig. Co. v. Glendale Irrig. Co.,* 17 Utah 2d 282, 288, 409 P.2d 616, 621 (1965)); that is, the affidavit must allege facts indicating that "[the] judge's behavior toward a party during [those prior] proceedings [was] extreme" and reflected a "deep-seated antagonism" toward the party requesting recusal. *Id.*

This conclusion seems particularly appropriate within the context of juvenile court child protection proceedings. Section 78–3a–104(1)(c) of the Utah Code gives the juvenile court exclusive original jurisdiction in proceedings concerning an abused, neglected, or dependent child. *See* Utah Code Ann. § 78–3a–104 (1996). Section 78–3a–520(1) [8] provides that the juvenile court's jurisdiction

8. This section was renumbered in 1997 and now appears at section 78–3a–121. *See* Utah Code Ann. § 78–3a–121 (Supp.1997).

over such a child "continues for the purposes of this chapter until he [or she] becomes 21 years of age." *Id.* § 78–3a–520 (1996). In harmony with this continuous jurisdiction, in this case and "[i]n many courts, child abuse and neglect cases are assigned to a specific judge or judicial officer at the time the case is first brought to court, and this initial judge conducts all subsequent hearings, conferences and trials." National Council of Juvenile and Family Court Judges, *Resource Guidelines: Improving Court Practice in Child Abuse & Neglect Cases* 19 (1995).[9] The rationale for using a single judge on a case has been expressed as follows:

> Family problems are complex but intricately intertwined so that the best treatment so far as the parties are concerned, particularly in regard to children, as well as the most consistent and efficient approach from the judicial point of view, is for the same judge to remain involved with the family along the continuum of the particular case.

*In re Quick*, 384 Pa.Super. 412, 559 A.2d 42, 46 (1989).

█ Because our statutory scheme allows the same judge to preside over all proceedings involving a particular child, any affidavit of bias must be based on more than the fact that the judge presided over prior proceedings or that he or she was exposed to the family's circumstances or some criticism in such proceedings. *See, e.g., In re D.T.,* 547 N.E.2d 278, 283 (Ind.Ct.App.1989) (requiring indication of clear bias for recusal of judge in termination proceeding, noting "[i]n the termination proceeding situation, the judge is very likely to have knowledge of previous proceedings."); *In re LaRue*, 113 N.C.App. 807, 440 S.E.2d 301, 303 (1994) (holding evidence that judge conducted review hearing eight months earlier "is not sufficient to support a finding of bias or prejudice," nor is "the knowledge of 'evidentiary facts' gained by the trial judge from the earlier proceedings"); *In re Quick*, 559 A.2d at 47 (stating complainant must establish "that bias actual-

ly existed in fact."); *Deahl v. Winchester Dep't of Soc. Serv.,* 224 Va. 664, 299 S.E.2d 863, 867 (1983) (" 'Merely because a trial judge is familiar with a party and his legal difficulties through prior judicial hearings ... does not automatically or inferentially raise the issue of bias.' " (quoting *Barry v. Sigler,* 373 F.2d 835, 836 (8th Cir.1967))).

█ In this case, Mother's affidavit of prejudice stated only that Judge Yeates had presided over prior hearings involving M.L., and that in those proceedings, the judge had issued rulings that were adverse to Mother's interest, was exposed to certain evidence that was inadmissible in a termination proceeding, and was criticized by the Guardian Ad Litem. None of these facts indicate that the judge acted improperly or with actual bias in the prior proceedings. Thus, none support the conclusion that Judge Yeates "had such a bias in favor of one party or prejudice against the other that he could not fairly and impartially determine the issues" that would be before him in the termination proceeding. *Poulsen,* 946 P.2d at 742 (citation omitted). Judge Valdez ruled properly, therefore, that Mother's affidavit was legally insufficient to mandate recusal.

### Prima Facie Case

Mother also argues that the juvenile court relied on improper grounds in failing to dismiss the State's claims based on parental unfitness and failure of parental adjustment after the State's case-in-chief. Mother contends the State failed to establish a prima facie case for either claim.

█ "A prima facie case is proven when evidence has been introduced which, in the absence of contrary evidence, would entitle the party with the burden of proof to judgment as a matter of law." *State v. Real Property at 633 East 640 North,* 942 P.2d 925, 931 n. 1 (Utah 1997) (Payne, D.J., concurring in result) (citing *State v. Wood,* 2 Utah 2d 34, 38, 268 P.2d 998, 1001 (1954)

---

9. One-family/one-judge calendaring of abuse and neglect cases is recommended by the National Council of Juvenile and Family Court Judges for several reasons; among them, that it "prevents parents from repeating excuses for lack of prog-

ress and wasting the court's valuable time and the child's priceless youth." *Resource Guidelines,* at 19. We believe this calendaring system is used by most if not all of Utah's juvenile courts.

(citation omitted)). Whether a party has established a prima facie case is a question of law which we review for correctness. *See Sorenson v. Kennecott–Utah Copper Corp.,* 873 P.2d 1141, 1144 (Utah Ct.App.1994). However, "we view the evidence in a light most favorable to the trial court's findings." *Id.*

### 1. Unfitness

■ Mother claims the juvenile court erred in determining that her history of incarceration was sufficient to establish a prima facie case of parental unfitness. Mother contends that, under Utah law, incarceration alone is insufficient to support this ground for terminating her parental rights.[10]

■ Utah case law supports the proposition forwarded by Mother that criminal activity and resultant incarceration alone cannot support the termination of parental rights. *See State ex rel. M.C.,* 940 P.2d 1229, 1235 (Utah Ct.App.1997) ("Although the acts leading to her incarceration were voluntary, the mother's resulting incarceration does not represent willful conduct justifying termination of her parental rights" based on abandonment to extent incarceration foreclosed opportunity to contact children.); *State ex rel. M.W.H. v. Aguilar,* 794 P.2d 27, 29 (Utah Ct.App.1990) (holding, in abandonment case, that "criminal conduct in and of itself is not a sufficient ground on which to terminate parental rights." (citing *In re K.S.,* 737 P.2d 170, 173 (Utah 1987))). However, Utah case law *does not* support the further proposition that repeated criminal activity and incarceration occurring after a parent has been the subject of DCFS referrals and treatment plans and after a child has been removed from the parent's custody, is insufficient to support a claim of parental unfitness. *Cf. State ex rel. M.W.H.,* 794 P.2d at 29 (stating evidence that "after his paternal rights had been reinstated by the Utah Supreme Court, [the father] knowingly engaged in criminal conduct that resulted in his incarceration"

could be considered along with "other evidence" to support finding of abandonment).

■ In this case, DCFS became involved with Mother two years prior to the criminal activity leading to her periods of incarceration. Despite several treatment plans offered by DCFS during this period to assist Mother in developing her parenting skills, Mother did little to improve those skills. Instead, within a three month period beginning in September 1994, Mother was arrested four times on various drug and other charges. Furthermore, after spending approximately six months in prison and after having lost custody of M.L. to the State, Mother knowingly violated her probation by taking prohibited drugs again, thereby jeopardizing M.L.'s treatment for his attachment disorder and resulting in her separation from M.L. for almost another year by reason of her reincarceration.

We believe the juvenile court's reference to Mother's "history of incarceration" contemplated all the above facts. We also believe such actions reflect a disregard by Mother for M.L.'s welfare that necessarily goes to Mother's fitness as a parent. Thus, we conclude that the juvenile court did not err in denying Mother's motion to dismiss the State's parental unfitness claim after presenting its case-in-chief.

### 2. Failure of parental adjustment

Mother also argues the juvenile court erred in refusing to dismiss the State's failure of parental adjustment claim.

■ Section 78–3a–403(2) of the Utah Code provides:

"Failure of parental adjustment" means that a parent ... [is] unable or unwilling within a reasonable time to substantially correct the circumstances, conduct, or conditions that led to placement of [his or her] child outside of [his or her] home, notwithstanding reasonable and appropriate ef-

---

10. Section 78–3a–408(2) of the Utah Code sets forth certain conditions which "the court shall consider" in determining whether a parent is unfit. Utah Code Ann. § 78–3a–408(2) (1996). However, the statute does not limit the court to only those conditions. *See id.* Thus a determi-

nation, such as was made by the juvenile court in this case, that the State has not made out any of the conditions set forth in that section does not preclude the court from finding that other conditions establish a prima facie case of unfitness.

forts made by [DCFS] to return the child to that home.

Utah Code Ann. § 78–3a–403(2) (1996). Thus, before terminating parental rights for failure of parental adjustment, "the juvenile court is required to find that DCFS first provided 'diligent' or 'reasonable' services" to the parent in question. *State ex rel. M.E.C.*, 942 P.2d 955, 960 (Utah Ct.App.1997). However, those services need not be offered indefinitely. Section 78–3a–408(3) of the Utah Code provides that if a parent "fail[s] to comply substantially with the terms and conditions of a [treatment] plan ... within six months after the date on which the child was placed or the plan was commenced, whichever occurs later, that failure to comply is evidence of failure of parental adjustment." Utah Code Ann. § 78–3a–408(3) (1996).

 M.L.'s first treatment plan was to begin May 26, 1995 and be completed by November 26, 1995. It required that Mother remain drug and alcohol free throughout the term of the plan; that she complete a parenting course; that she involve herself in M.L.'s therapy; that she resolve all criminal charges and obey the law; that she undergo a psychological evaluation; that she complete an inpatient drug rehabilitation program; that she complete the Mothers with Children program at the House of Hope; and that she obtain stable housing and full employment.

On August 16, 1995, Mother tested positive for Valium. Her illicit drug use was in direct violation of her treatment plan. Furthermore, due to her resultant expulsion from the House of Hope and reincarceration, she was unable to comply with the majority of the treatment plan's other requirements.

This evidence alone is sufficient under section 78–3a–408(3) to establish a prima facie case of failure of parental adjustment. We thus conclude that the trial court properly denied Mother's motion to dismiss this ground for termination.[11]

### Sufficiency of the Evidence

Mother next claims that the juvenile court erred in terminating her parental rights because it failed to adequately consider her present parenting ability—i.e., her ability existing at the time of the termination trial—to care for M.L. This evidence, Mother claims, should have been sufficient to overcome the deficiencies in her prior conduct. The State, however, contends that Mother's efforts came too late and that the juvenile court was not required to consider evidence of Mother's present ability when Mother took no action to ameliorate her condition within a reasonable period after M.L.'s removal.

 In reviewing a termination decision, "[w]e will not disturb the juvenile court's findings and conclusions unless the evidence clearly preponderates against the findings as made or the court has abused its discretion." *State ex rel. C.Y. v. Yates*, 765 P.2d 251, 255 (Utah Ct.App.1988) (citation omitted); *see also State ex rel. E.D. v. E.J.D.*, 876 P.2d 397, 402 (Utah Ct.App.1994) ("Findings of fact in a parental rights termination proceeding are overturned only if they are clearly erroneous.").

Under Utah's statutory scheme, in most cases, a parent is given approximately twelve months after a child is initially removed from the parent's custody to show progress in changing the conduct or condition which required such removal. *See* Utah Code Ann. § 78–3a–312(1) (1996) (stating "dispositional review hearing shall be held ... no later than 12 months after the original removal of the child"); *id.* § 78–3a–312(2)(a) (stating child shall be returned to custody of parent unless such return "would create a substantial risk of detriment to [the child]" and

11. We thus reject Mother's argument that the juvenile court erred in failing to dismiss this claim because the court later indicated it did not believe DCFS had provided Mother with reasonable services once she was finally released from prison in 1996. *Cf. State ex rel. M.E.C.*, 942 P.2d at 960 (stating juvenile court's "express finding that DCFS failed to make a 'diligent effort' to provide services is directly contrary to, and cannot support, a finding of failure of parental adjustment."). As the State points out, the court's comment was in reference to the State's claim based on "token efforts," *see* Transcript at p. 323, which the court did dismiss. Furthermore, a determination by the court that DCFS was no longer providing services to Mother almost two years after M.L.'s removal from Mother's home in no way implies that the services provided prior to then were insufficient.

"failure of a parent ... to ... comply with, in whole or in part, or to meet the goals of a court approved treatment plan constitutes prima facie evidence that return of the child to that parent would be detrimental."). If no progress is shown within twelve months, the court must begin the process for determination of the child's final placement. *See id.* § 78–3a–312(3)(a) (stating if child is not returned to parent, court shall "order the division to develop a permanent plan, and schedule a hearing within 120 days ... to make a final determination regarding ... the most appropriate final plan for the child").[12]

The primary reason for the time frame is apparent: The State has an interest in removing the child from the legal limbo of State custody as soon as possible so as to provide that child with a permanent and stable home. *See, e.g, State ex rel. J.N.*, 960 P.2d 403, 407–08 (Ct.App.1998). However, we also believe that this time frame reflects a recognition of the connection between a parent's inaction over a long period of time in ameliorating the conduct or condition that required the child's removal, and the deterioration of the parent-child relationship during that time period. *See In re B.M.*, 165 Vt. 331, 682 A.2d 477, 481 (1996) ("Past circumstances that have affected the parent-child relationship will of course be relevant to whether a parent can resume a caregiving role."). Mindful of this possible deterioration of the parent-child relationship during the time a parent is or should be attempting to improve, we consider what weight a juvenile court must give evidence of a parent's present parenting ability in a termination hearing.

In this case, the juvenile court based its termination of Mother's rights on parental unfitness, *see* Utah Code Ann. § 78–3a–407(3) (1996), and failure of parental adjust-

ment, *see* Utah Code Ann. § 78–3a–407(5) (1996). It determined that Mother was unfit "because of her chronic involvement with drugs and her resultant incarcerations," which "had been harmful to the emotional well-being of her son and has resulted in multiple and prolonged placements outside of the home." The court concluded there was a failure of parental adjustment because Mother "failed to remedy the circumstances, conduct and conditions that led to her son[']s placement outside of the home in a timely manner" and because Mother "is still not in a position to safely receive custody of her son." In both cases, Mother argues the court gave insufficient weight to evidence of her present ability as a parent.

■ Utah case law appears consistent in holding that, to support termination of a parent's rights for parental unfitness, the State must establish there is no likelihood that the parent will, within a reasonable period of time, gain the parenting skills necessary to reunify that parent with his or her child. *See, e.g., In re S.R.*, 735 P.2d 53, 56 (Utah 1987) (stating State must show parent's "conduct or condition ... cannot be corrected with reasonable efforts" and noting juvenile court's finding that parent's conduct was "unchanging"); *In re Winger*, 558 P.2d 1311, 1313 (Utah 1976) (stating termination is "drastic remedy" that "should be resorted to only in extreme cases," such as "when it is manifest the home itself cannot, or will not, correct the evils which exist."); *State ex rel. M.E.C.*, 942 P.2d at 958 (affirming termination where juvenile court found "grounds existed at the time the [treatment] plan was ordered, and continued to exist at the time of the termination hearing."); *State ex rel. P.H. v. Harrison*, 783 P.2d 565, 570, 572 (Utah Ct.App.1989) (holding "state must demonstrate that the parent 'cannot or will not

12. These provisions were amended in 1997. The amendments fortify the Legislature's intent that a parent show a change of circumstances within one year of the child's removal. *See, e.g., Utah Code Ann.* § 78–3a–312(1) (Supp.1997) (stating "permanency hearing shall be held ... no later than 12 months after the original removal of the child"); *id.* § 78–3a–312(2)(a) (stating child shall be returned to custody of parent unless such return "would create a substantial risk of detriment to the child[ ]" and "failure of a parent ...

to ... comply with, in whole or in part, or to meet the goals of a court approved treatment plan constitutes prima facie evidence that return of the child to that parent would create a substantial risk of detriment."); *id.* § 78–3a–312(3)(a) (stating if child "is not returned to his parent ... at the permanency hearing, the court shall order termination of reunification services to the parent, and make a final determination" regarding "the most appropriate final plan for the child.").

correct the evils which exist,' " (quoting *In re Walter B.*, 577 P.2d 119, 124 (Utah 1978)), because " '[c]hildren cannot remain in limbo indefinitely where there is no reasonable likelihood of their parents gaining necessary parenting abilities.' " (quoting *State ex rel. C.Y.*, 765 P.2d at 255–56)); *State ex rel. C.Y.*, 765 P.2d at 255 (stating " 'parent's conduct or condition must be such that it cannot be corrected, after notice and opportunity, with reasonable efforts of assistance.' " (quoting *In re S.R.*, 735 P.2d at 56)). This case law certainly suggests that the juvenile court must consider a parent's ability at the time of the termination hearing in determining whether termination is appropriate.

It is less clear whether Utah law requires consideration of present conditions or conduct where termination is based on a failure of parental adjustment. Section 78–3a–403(2) of the Utah Code provides the following definition of failure of parental adjustment:

> "Failure of parental adjustment" means that a parent ... [is] unable or unwilling within a reasonable time to substantially correct the circumstances, conduct, or conditions that led to placement of [his or her] child outside of [his or her] home, notwithstanding reasonable and appropriate efforts made by [DCFS] to return the child to that home.

Utah Code Ann. § 78–3a–403(2) (1996). "Thus, to find failure of parental adjustment, the court must find (1) that the parent did not correct the troubling circumstances 'within a reasonable time' and (2) that DCFS made 'reasonable and appropriate efforts' to return the child to the parent." *State ex rel. J.N.*, 960 P.2d at 411. Furthermore, section 78–3a–408(3) of the Utah Code states that a parent's "fail[ure] to comply substantially with the terms and conditions of a [treatment] plan ... within six months after the date on which the child was placed or the plan was commenced ... is evidence

of failure of parental adjustment." Utah Code Ann. § 78–3a–408(3) (1996). This law seems to indicate that if a parent fails to correct "the troubling circumstances" within a reasonable time after a plan is commenced, termination is appropriate, regardless of the parent's belated efforts, however promising, after that "reasonable time" has expired. However, Utah case law is not entirely consistent on that issue. For instance, in *State ex rel. J.N.*, this court noted that, although a court may terminate reunification services after a reasonable time period, such termination of services does not make a termination of parental rights inevitable: "Although it may be a difficult feat to accomplish, the parent may still be able to change circumstances such that when the petition is tried, the juvenile court will not find by clear and convincing evidence grounds for terminating parental rights." 960 P.2d at 408 n. 8 (noting *A.E. v. Christean*, 938 P.2d 811, 816 (Utah Ct.App.1997), implies "that at termination hearing parent may be able to show improvement in parent's situation and behavior has occurred since permanency hearing was held").

However, even assuming that in both cases a court must consider evidence of a parent's present ability at a termination hearing, the critical question raised by Mother on appeal is whether the juvenile court may consider a parent's past conduct in determining what weight to give that present ability evidence. We believe that, in fact, such consideration is necessary. We conclude that the weight which a juvenile court must give any present ability evidence is necessarily dependent on the amount of time during which the parent displayed an unwillingness or inability to improve his or her conduct and on any destructive effect the parent's past conduct or the parent's delay in rectifying the conduct has had on the parent's ability to resume a parent-child relationship with the child.[13] Thus, although the

---

13. We note that Utah law requires the finding of a ground for termination of a parent's rights before the court can consider the child's best interests. *See* Utah Code Ann. § 78–3a–402(2) (1996) (stating "if a parent is found ... to be unfit or incompetent based upon any of the grounds for termination described in this part,

the court shall then consider the welfare and best interest of the child of paramount importance"); *State ex rel. G.D. v. L.D.*, 894 P.2d 1278, 1284 (Utah Ct.App.1995) (stating "it is unconstitutional to terminate a parent's rights based upon a finding of the best interests of the child without first finding that the parent is below some mini-

court has a duty to look forward—i.e., to look at the parent's present ability and the likelihood that the parent will be able to resume parenting within a reasonable time—the court must consider such evidence in light of the parent's past conduct and its debilitating effect on the parent-child relationship. That is, if a parent has demonstrated some improvement in parenting ability but not a strong likelihood that the parent can provide a proper home for the child in the very near future, after a long period of separation, a history of problems and failure to remedy, and deterioration of the relationship between the child and parent, this court should not overturn a court's order terminating parental rights.

■ In this case, the State presented evidence that M.L. suffered from a reactive attachment disorder linked to Mother's drug use and exacerbated by Mother's long periods of separation from the child. The State also demonstrated that during most of M.L.'s time in State custody, because of Mother's incarceration, M.L. was able to visit with Mother only about once a month. During those visits, Mother's interaction with M.L. was more as playmates than as parent and child. In particular, Mother rarely placed appropriate constraints on M.L.'s actions, and she consistently rejected suggestions made by DCFS to develop a more parental role with M.L. Mother herself admitted that M.L. acted out at times during their visits, sometimes hitting her and asking that she leave him alone. Finally, M.L. responded negatively to the visits, becoming more irritated and unmanageable after the visits and sometimes even wetting his bed. Whatever Mother's present situation and desire, there is no question that her conduct in the past has affected her relationship with M.L. and that her current interaction with him reflects Mother's continued inability to fulfill a parental role. Although a parent may be able to overcome the detrimental effect on her child of prior behavior, this will not always be the case. "From the child's perspective, at least,

the earlier period of stagnation is not necessarily wiped out by the later improvement. The harm may have been done." *In re B.M.*, 165 Vt. 331, 682 A.2d 477, 480 (1996). In this case, Mother appears to have created an unhealthy relationship with M.L. in the past which she is not presently willing or able to overcome. We thus conclude the juvenile court had sufficient evidence to terminate Mother's parental rights on the basis of Mother's unfitness.

■ We also believe the juvenile court had sufficient evidence upon which to order termination for failure of parental adjustment. As the State demonstrated, Mother failed almost completely to fulfill any of the obligations imposed upon her in the first treatment plan involving M.L. Furthermore, although Mother's progress on the second treatment plan was more substantial, she still failed to provide DCFS with a psychological evaluation, which was to serve as the basis for future plans. Most importantly, however, the juvenile court found that, although Mother "was involved in numerous self-improvement courses and programs [while in prison,] she has been unable to internalize what she has been taught relative to child care and child development in the courses she completed." This finding indicates that, despite Mother's contentions, her present ability remains inadequate. We believe there is sufficient evidence in the record to support that finding.

For example, Mother's testimony indicates that she holds her son, R.P., responsible for the difficulties between R.P. and M.L., Sr. Despite evidence to the contrary, Mother cannot admit that M.L., Sr. played any negative role in that relationship. Consistent with this apparent denial, instead of suggesting that she would want to rectify her situation with R.P. so as to parent both R.P. and M.L., Mother readily suggests she would essentially give up R.P. if that means she could keep M.L.

mum threshold of fitness." (citing *In re J.P.*, 648 P.2d 1364, 1374–77 (Utah 1982))). However, consideration of the effect of a parent's conduct on the parent-child relationship does not so much address whether it is in the child's best

interests to be returned to the parent as whether the parent has so damaged his or her relationship with the child that the parent will not be able to resume his or her parental role.

In addition, Mother continues to defend prior decisions to leave her children with an unstable daughter and known drug users, seeing no difficulty in trusting such people "to take good care of the children." She also fails to see any problem with her daughter, N.T., smoking marijuana, indicating instead that N.T. has no drug problem. As for her own drug addiction, Mother understands addiction is a lifelong disease but believes she will not need further substance abuse treatment and at most might need support groups "here and there".

Concerning M.L. directly, Mother admits she has rejected numerous suggestions by DCFS on how to improve her interaction with M.L., and justifies her behavior by stating that she "should be able to do what [she] want[s] with [her] son." When testifying as to the parenting skills she has learned, Mother cites to learning CPR and "learning children have choices" as the only examples.

This evidence adequately supports the juvenile court's finding that Mother "has been unable to internalize what she has been taught relative to child care and child development." Furthermore, such a finding defeats the "present ability" defense asserted by Mother and, along with the record evidence concerning Mother's prior conduct, supports termination of Mother's parental rights based on failure of parental adjustment. *See State ex rel. C.Y.*, 765 P.2d at 255 (holding effort to improve one's parenting skills is not determinative if "no significant improvement in [the parent's] parenting skills has been noted despite [the parent's] efforts."). Thus, the juvenile court did not err in terminating Mother's parental rights.

### New Trial

Mother's final argument is that this court should remand her case for a new trial because, after the termination hearing, she was finally able to obtain a summary of her 1995 psychological evaluation.

■ "The appellate courts of this state have consistently refused to address issues ... that are raised for the first time on appeal. This principle applies equally to proceedings originating before the juvenile courts." *State ex rel. E.D. v. E.J.D.*, 876 P.2d 397, 401 (Utah Ct.App.1994) (citations omitted); *see also State ex rel. M.S.*, 781 P.2d 1289, 1291–92 (Utah Ct.App.1989); *cf. State v. Kinder*, 14 Utah 2d 199, 201, 381 P.2d 82, 84 (Utah 1963) (refusing to consider defendant's request for new trial based on newly discovered evidence where "no application for a new trial has been presented to the trial court," stating appellate court "is not the proper forum to entertain what is, in effect, a motion for a new trial. Its jurisdiction, with the exception of extraordinary writs, is appellate only."). In this case, Mother made no motion for a new trial to the juvenile court. We thus decline to address the merits of her claim here.

### CONCLUSION

We conclude Judge Valdez did not err in determining that Mother's Affidavit of Prejudice was legally insufficient where the affidavit merely speculated as to Judge Yeates's possible bias from past involvement with M.L.'s case. We also conclude there was sufficient evidence to support the juvenile court's denial of Mother's motion to dismiss the State's claims of parental unfitness and failure of parental adjustment, and to support the termination of Mother's parental rights. Finally, we decline to consider Mother's request for a new trial because Mother did not make that motion first in the juvenile court. We thus affirm the juvenile court's termination of Mother's parental rights in M.L.

DAVIS, P.J., and ORME, J., concur.