217 P.3d 278 (2009)
2009 UT App 232
STATE of Utah, in the interest of A.H. and J.H., persons under eighteen years of age.
M.S., Appellant,
v.
State of Utah, Appellee.
No. 20080487-CA.
Court of Appeals of Utah.
August 27, 2009.
*279 Colleen K. Coebergh, Salt Lake City, for Appellant.
Mark L. Shurtleff, Atty. Gen., and John M. Peterson, Asst. Atty. Gen., Salt Lake City, for Appellee.
Martha Pierce and David L. Johnson, Salt Lake City, Guardians Ad Litem.
Before Judges GREENWOOD, BENCH, and ORME.

OPINION
ORME, Judge:
¶ 1 M.S. (Mother) appeals the juvenile court's order terminating her parental rights in A.H. and J.H. (the Children). Mother argues that insufficient evidence existed to support termination of her parental rights. More specifically, Mother asserts that the court erred in relying heavily on unproven criminal charges pending against her at the time of the termination hearing, especially because the court did not require the State to prove the criminal conduct by clear and convincing evidence. We affirm.

BACKGROUND[1]
¶ 2 In March 2006, the juvenile court removed the Children from Mother's custody after it concluded she had neglected the Children by exposing them to a violent domestic dispute.[2] At the court's direction, the Division *280 of Child and Family Services (DCFS) prepared a service plan that required Mother, among other things, to receive out-patient drug treatment,[3] have no contact with the Children's father, and receive a domestic violence assessment. Although Mother initially struggled to comply with the plan, by June 2007one year and three months after the Children were first placed in DCFS custodyMother had completed her service plan and regained custody, with DCFS providing protective supervision. In a September 2007 permanency hearing, the juvenile court determined that DCFS should prepare reports to release the Children from the court's jurisdiction with an expected effective date in November 2007.
¶ 3 However, in November 2007, five months after regaining custody, Mother's life fell apart. DCFS learned of allegations that Mother had been drinking, using marijuana, and contacting the Children's father. Then, Mother was arrested and incarcerated on felony robbery charges. As a result, the Children were again removed from Mother's care and placed in DCFS custody. In January 2008, the State petitioned for termination of Mother's parental rights based on allegations that Mother continued to use drugs and because she had been arrested on two robbery charges.
¶ 4 At the termination hearing in May 2008, only the DCFS caseworker and Mother testified. The caseworker readily acknowledged that Mother had made improvements, was "a wonderful mom when ... focused," and loved the Children. But she also testified that Mother's continued "poor choices" led to instability that would prevent her from providing the Children with stable, long-term care. The caseworker also testified about the Children's current foster family and their progress during that placement.
¶ 5 Mother testified and denied being at Valley Fair Mall or Wells Fargo on November 16, 2007. When the juvenile court further questioned Mother about being in the van that had been impounded by police on that date, Mother insisted she was not and tried to explain, but the court insisted on a "yes" or "no" answer. Mother admitted being at a cell phone store with her van near Valley Fair Mall on November 17, 2007, that she was the owner of the impounded van, that she was with one other person, and that a gun was found in her van.[4]
¶ 6 Mother's counsel advised Mother of her Fifth Amendment rights as she began to testify and interrupted her testimony to remind her of her rights. Mother's admissions, and failure to invoke her rights, seemed to make both Mother's counsel and the court uneasy, and the court suggested that Mother's counsel sit next to her as she testified. Prior to this arrangement, Mother had only invoked her right not to incriminate herself once, refusing to answer whether she was at Kohl's. Mother subsequently invoked the Fifth Amendment on a number of occasions, including when asked if she knew Carrie McCovis, Patrick Valdez, or a person named "Shooter"; whether McCovis was Mother's cellmate and if conversations had occurred between the two of them; if Mother was wearing a "hoodie" on the day in question; and whether Shooter had left the gun in Mother's van. Mother's counsel also informed the court that Mother planned to invoke the Fifth Amendment on any questions relating to the events of November 17, 2007.
¶ 7 Mother further testified to the status of the robbery charges: she had pled not guilty and was awaiting her preliminary hearing, which was scheduled for May 13, 2008. Although Mother seemed optimistic about her release and a favorable disposition of the charges against her, she did not know when she would be released.
¶ 8 Mother's testimony also included the dates and reasons for her three recent incarcerations, which totaled approximately forty-seven days in a six-month period. Mother *281 had been incarcerated between November 17 and December 6, 2007, based on the initial robbery charges. After being released, Mother was again incarcerated for about ten days in March 2008 because she failed to attend a hearing concerning the robbery charges. Mother's third incarceration, which resulted from Mother violating her pretrial release by being charged with public intoxication, began on April 15 and continued through May 1, 2008, the date of her termination hearing.
¶ 9 Mother also testified about her history, including that she had had three different addresses since December; had experienced employment difficulties;[5] had been in drug rehabilitation treatment twice in her life; and had experienced stress and needed support in caring for the children during the month or two preceding her arrest on the robbery charges.
¶ 10 Mother agreed that she had been unable to care for the Children for three to four of the previous six months. She also acknowledged her inability to immediately care for the Children because she was still incarcerated and admitted that she had not, during the last six months, provided them with the stable environment she knew they needed. Stating that she really had changed and that she had previously provided the Children with the love and stability they required, Mother was confident that she would be able to provide quality care and a stable environment for the Children once the robbery charges were resolved, but she was unsure when that would be.
¶ 11 Based on this evidence, the court terminated Mother's parental rights. The court's factual findings referenced Mother's repeated incarcerations, the charges filed against her, and the "substantial likelihood that [Mother would] not be capable of exercising proper and effective parental care to the children in the near future." The court also found that Mother had admitted that "she had been ... near Valley Fair Mall[] when a robbery occurred at Kohls"; "her van had been involved in the robbery and had been impounded"; "a gun was found in her van"; and "she took the 5th and refused to answer any other questions on the grounds that it may incriminate her." In addition, the court considered Mother's difficulties in finding stable housing and employment and Mother's refusal to continue to seek support from, or to continue contact with, her drug rehabilitation center. Finally, the court found that the Children needed a stable environment, that they were "thriving" in their current foster placement, and that the Children's best interests would be served by terminating Mother's parental rights.
¶ 12 The court determined that termination was appropriate on four separate grounds: (1) neglect, see Utah Code Ann. § 78A-6-507(1)(b) (2008); (2) unfitness or incompetence, see id. § 78A-6-507(1)(c); (3) failure to adjust, see id. § 78A-6-507(1)(e); and (4) failure to remedy the circumstances causing the court-supervised out-of-home placement, with little likelihood Mother would be able to properly parent in the near future, see id. § 78A-6-507(1)(d)(i)-(iii). The court concluded "[t]hat it is in the children's best interests to be adopted by [their] foster parents or other appropriate individuals where they are loved, properly cared for, and protected from neglect and abuse."

ISSUES AND STANDARD OF REVIEW
¶ 13 Mother contends on appeal that insufficient evidence existed to support the court's conclusions of neglect, unfitness, failure of parental adjustment, and unwillingness to remedy the cause of the Children's out-of-home placement. She particularly assails what she characterizes as the court's heavy reliance on the unproven criminal charges pending against her.
Whether a parent's rights should be terminated presents a mixed question of law and fact. Certainly, the legal standard of unfitness is the ultimate question, but such decisions rely heavily on the juvenile court's assessment and weighing of the facts in any given case. Because of the *282 factually intense nature of such an inquiry, the juvenile court's decision should be afforded a high degree of deference.... [T]he juvenile court's decision could be overturned only if it either failed to consider all of the facts or considered all of the facts and its decision was nonetheless against the clear weight of the evidence. When a foundation for the court's decision exists in the evidence, an appellate court may not engage in a reweighing of the evidence.
In re B.R., 2007 UT 82, ¶ 12, 171 P.3d 435.

ANALYSIS
¶ 14 Utah Code section 78A-6-507(1) provides, in relevant part, that a
court may terminate all parental rights with respect to a parent if the court finds any one of the following: ...
(b) that the parent has neglected or abused the child;
(c) that the parent is unfit or incompetent; (d)(i) that the child is being cared for in an out-of-home placement under the supervision of the court or the division;
(ii) that the parent has substantially neglected, wilfully refused, or has been unable or unwilling to remedy the circumstances that cause the child to be in an out-of-home placement; and
(iii) that there is a substantial likelihood that the parent will not be capable of exercising proper and effective parental care in the near future; [or] (e) failure of parental adjustment....
Utah Code Ann. § 78A-6-507(1)(b)-(e). In determining whether termination grounds exist, a court is required "to consider the totality of the evidence regarding" a parent's ability to care for the child. In re B.R., 2007 UT 82, ¶ 13, 171 P.3d 435. Thus, "all of [a parent's] conduct up to the termination trial" is considered, and "the ... court must weigh a parent's past conduct with her present abilities," id., looking, in part, at improvements, the "debilitating effect" of past conduct, "deterioration of the [parent-child] relationship," and the likelihood of being able to provide proper care soon,[6]id. (citation and internal quotation marks omitted). The supporting facts and grounds for termination of parental rights must be proven by clear and convincing evidence. See Utah Code Ann. § 78A-6-506(3) (2008); In re J.C.O., 734 P.2d 458, 461-62 (Utah 1987); In re D.G., 938 P.2d 298, 301 (Utah Ct.App.1997).

I. The Court Properly Considered Mother's Incarceration in Evaluating Mother's Parenting Ability.
¶ 15 Mother's main contention is that the juvenile court incorrectly "placed primary importance on the unproven criminal allegations" against her and "speculat[ed] that she would be convicted and incarcerated." Although "criminal activity and resultant incarceration alone cannot support the termination of parental rights," "repeated criminal activity and incarceration occurring after a parent has been the subject of DCFS referrals and treatment plans and after a child has been removed from the parent's custody" can be considered. In re M.L., 965 P.2d 551, 558 (Utah Ct.App.1998). See also In re M.W.H., 794 P.2d 27, 29 (Utah Ct.App. 1990) (indicating that "knowingly engaging] in criminal conduct that resulted in [a parent's] incarceration" can be considered along with other evidence in a termination proceeding). As this court has previously concluded, a "history of incarceration," or behavior leading to repeated incarceration, "reflect[s] a disregard by [a mother] for [her child's] welfare that necessarily goes to [the mother's] fitness as a parent." In re M.L., 965 P.2d at 558 (internal quotation marks omitted).
¶ 16 Thus, the court in this case properly considered the unproven criminal charges and repeated incarcerations, not as proof of criminal wrongdoing, but as bearing on Mother's ability to provide the Children proper care. See id. In the two years during which the court had jurisdiction, Mother *283 had custody of the Children for only five months. Although Mother showed improvements in her parenting ability, on the day of the termination hearing Mother was unable to care for the Children and had been unable to do so for three to four of the previous six months. Significantly, she was unsure when she would next be able to care for the Children. See generally In re D.H., 2009 UT App 32, ¶¶ 13, 14, 204 P.3d 210 (affirming juvenile court's ruling that termination was appropriate, even though the "[f]ather ha[d] made substantial progress on his drug problem," because he "still engaged in criminal conduct" that led to incarceration, leaving him unfit because he was "unable to care for his child") (second alteration in original) (internal quotation marks omitted).
¶ 17 Although the Children had been placed in DCFS custody for the second time in two years, Mother made choices that resulted in her incarceration and her unavailability to care for the Children. Mother's initial arrest and incarceration were not as demonstrative of her inability to care for the Children as was her subsequent inability to stay out of jail. After her initial arrest, Mother missed a hearing and was ticketed for public intoxication. These violations of the terms of her pretrial release resulted in two additional incarcerations, which actually exceeded the duration of her initial incarceration due to her arrest on robbery charges. The revocation of her pretrial release by reason of these poor decisions precluded any possibility that she could care for the Children until the robbery charges were resolved. These actions demonstrate Mother's disregard for the Children's welfare and Mother's inability to change her behavior in a way that would enable her to care for the Children. See In re M.L., 965 P.2d at 558 (stating "that repeated criminal activity and incarceration" may be considered in termination analysis, especially after a child has been in DCFS custody, and that such actions demonstrate the parent's disregard for the child's welfare).
¶ 18 The juvenile court also correctly considered the likelihood that the felony charges were well-taken[7] because the possibility of long-term incarceration bore directly on whether Mother would be unable to parent the Children for a significant period of time. See id. at 561-62 ("[T]he court has a duty to look forwardi.e., to look at the parent's present ability and the likelihood that the parent will be able to resume parenting within a reasonable time[, and] the court must consider such evidence in light of the parent's past conduct and its debilitating effect on the parent-child relationship."). Moreover, although there was the possibility that Mother would be acquitted of all charges, at the time of the termination hearing her incarceration made her unable to care for the Children, both then and in the foreseeable future. See generally id. at 561 ("[C]ase law certainly suggests that the juvenile court must consider a parent's ability at the time of the termination hearing in determining whether termination is appropriate."). See also In re G.C., 2008 UT App 270, ¶ 13, 191 P.3d 55 (concluding that testimonial evidence concerning alleged criminal behavior was properly considered in determining a parent's current fitness).

II. Criminal Conduct Must Be Proven if the Court Finds Lack of Parental Ability Based Solely on Criminal Wrongdoing.
¶ 19 We agree with Mother that the State must prove criminal conduct actually occurred if the State intends to rely on unproven criminal charges to prove a parent lacks proper judgment or parental ability based solely on criminal wrongdoing. Although the juvenile court was entitled to "draw an adverse inference," i.e., to infer culpability when Mother invoked her Fifth Amendment right, Chen v. Stewart, 2005 UT 68, ¶ 31 n. 4, 123 P.3d 416, "the inference is not enough, by itself, to sustain a judgment against the defendant without some other evidence," First Fed. Sav. & Loan Ass'n v. Schamanek, 684 P.2d 1257, 1268 (Utah 1984). We have thoroughly reviewed the transcript in this case to see if these precepts applied here.
*284 ¶ 20 Oddly, the record reveals that Mother's answers to questions when she did not invoke the Fifth Amendment were more incriminating than any implication that arose from those instances when she did invoke her Fifth Amendment right. The questions Mother refused to answer included whether Mother was at Kohl's, knew certain people who were never connected by testimony to the robbery charges, had conversed or shared a jail cell with one person, had been wearing a "hoodie," and knew if someone else had left the gun in her van. In contrast, Mother admitted that a gun was found in a van she owned and that the police had impounded her van as evidence. We share counsel's frustration because Mother's answers to questions, as well as the inferences arising from her refusal to answer, did not establish that Mother was a party to a crime, and the evidence did not otherwise include any meaningful details of the crime. If the juvenile court had papers before it that connected the facts to an actual crime that had been committed, we do not see them in the record.
¶ 21 Docketing statements showed the crimes charged but did not give any details of the crimes.[8] Mother's testimony related to the events of November 16 and 17, 2007, and included where she was, what she was doing, and who she was with. While the court seems to have assumed Mother's testimony related to the charges, this is far from clear if one merely reads the transcript.
¶ 22 The State would be better advised in such cases to produce direct evidence to prove any alleged criminal behavior if it intends to rely on charged criminal behavior as a basis for terminating parental rights. Witnesses such as the arresting officer or a store clerk may have linked the facts to the occurrence of actual criminal activity. See generally In re G.C., 2008 UT App 270, ¶ 13, 191 P.3d 55 (determining that testimonial evidence concerning alleged criminal history was properly admitted as bearing on a parent's current fitness). That said, the State is not required to pre-try the criminal case, but it would be required to prove that the parent was involved in criminal activity, and that necessarily means establishing salient details of the criminal activity that occurred.
¶ 23 In the instant case, it is almost as though both the State and the juvenile court, in an effort to tip-toe around Mother's constitutional rights, felt that not too much specificity about the criminal case should enter the record. We tend to agree with Mother's counsel that the actual facts in the robbery merited more attention, lest Mother be adversely impacted by mere innuendo or a general specter of criminal wrongdoing to which she had some merely tangential connection.
¶ 24 And while the State carries the burden of proving unfitness, neglect, or other termination grounds by clear and convincing evidence, it is not required to prove each separate occurrence indicative of such grounds, including every fact touching on criminal wrongdoing to the extent relevant, by clear and convincing evidence, so long as facts establishing at least one such ground are shown by clear and convincing evidence. See Utah Code Ann. § 78A-6-506(3) (2008) ("The court shall in all cases require the petitioner to establish the facts by clear and convincing evidence, and shall give full and careful consideration to all of the evidence presented with regard to the constitutional rights and claims of the parent[.]"); In re D.G., 938 P.2d 298, 301 (Utah Ct.App.1997) ("In determining whether to terminate the relationship between a parent and a child, a juvenile court must find the [statutory] grounds for termination ... by clear and convincing evidence."). We reject Mother's *285 argument to the contrary.[9]
¶ 25 Following our careful review of the record, it is clear that the juvenile court did not rely solely on the alleged criminal activity in terminating Mother's parental rights. Those rights were terminated because her actions showed she was unfit, neglectful, failed to remedy the conditions giving rise to the out-of-home placement, and failed to adjust. See Utah Code Ann. § 78A-6-507(1)(b)-(e) (2008). Totally aside from the criminal charges, the State proved by clear and convincing evidence that Mother was not available to care for the Children. Mother admitted that she had not been able to care for the Children in the recent past or at the time of the hearing, and she did not know when she would be able to care for them in the future. Mother's then-current incarceration, along with her two previous incarcerationsall within a six-month periodwere no doubt concerning to the juvenile court, especially because they arose in the context of pending felony charges. But of much more concern was that those difficulties arose on the heels of Mother's unstable employment and housing situations, and against the background of the Children's prior removal based on Mother's neglect and substance abuse. The juvenile court had been involved with Mother and the Children for two years, and although some of the issues had been largely resolved even as others arose and evolved, the bottom line was that Mother was repeatedly unable to properly care for the Children. Given these circumstances, the termination of Mother's parental rights was consistent with the juvenile court's findings, and the findings were not against the clear weight of the evidence.

CONCLUSION
¶ 26 The juvenile court properly considered Mother's incarcerations and pending criminal charges as one aspect of her inability to parent the Children. We affirm the juvenile court's decision to terminate Mother's parental rights because its findings, taken as a whole, are supported by the evidence of record and fully support its decision.
¶ 27 Affirmed.
¶ 28 I CONCUR: PAMELA T. GREENWOOD, Presiding Judge.
¶ 29 I CONCUR IN THE RESULT: RUSSELL W. BENCH, Judge.
NOTES
[1] We recite the facts in detail because termination of parental rights cases are highly fact sensitive. See In re M.L., 965 P.2d 551, 553 n. 1 (Utah Ct.App.1998).
[2] Although our focus is on Mother, the Children's father's rights were also terminated. He did not participate in the termination hearing and does not appeal.
[3] Mother later transferred to in-patient drug treatment because the out-patient program was not working for her.
[4] These references to the mall, the van, the gun, and other details are not fully explained in the record andjust as they do in this opinionlack context. Apparently those present at the termination hearing understood these facts to pertain rather directly to the alleged robberies.
[5] Mother had a job in November that lasted three weeks, one in March that lasted three days, and one for which she had been hired but that she was unable to start by reason of her April incarceration.
[6] Under an unfitness or neglect determination, the juvenile court must also consider specified statutory factors, but the court is not limited to those considerations enumerated by statute. See Utah Code Ann. § 78A-6-508(2) (2008) ("In determining whether a parent or parents are unfit or have neglected a child the court shall consider, but is not limited to, the following circumstances, conduct, or conditions....").
[7] Although it was not before the juvenile court at the termination hearing and has not factored into our decision, we note that Mother eventually pled guilty to one count of attempted robbery.
[8] The juvenile court concluded that Mother "admitted that she had been ... near Valley Fair Mall[] when a robbery occurred at Kohls." Although the docketing statement showed Mother had been charged with two counts of robbery, and provided the addresses where the robberies occurred, it did not give the details of the robbery such as that the robbery occurred at Kohl's. And although the court is allowed to infer criminal behavior when the Fifth Amendment is invoked in a civil proceeding, see Chen v. Stewart, 2005 UT 68, ¶ 31 n. 4, 123 P.3d 416, the fact that a robbery may have occurred at Kohl's does not necessarily mean Mother was involved just because she was in the neighborhood.
[9] Only one legal ground is needed for termination of parental rights. See Utah Code Ann. § 78A-6-507(1) (2008) ("The court may terminate all parental rights ... if the court finds any one of the [statutory grounds for termination]."). Even without considering incarceration or the criminal charges, the clear weight of the evidence established that Mother was unfit and neglectful. See id. § 78A-6-507(1)(b)-(c). Utah Code section 78A-6-508 requires a court to consider several factors in determining unfitness and neglect. See id. § 78A-6-508(2). The statutory factors include "habitual or excessive use of" drugs or alcohol "that render[s] the parent unable to care for the child"; "failure to provide the child with adequate food, clothing, shelter, education, or other care necessary for the child's physical, mental, and emotional health and development"; and "a history of violent behavior." Id. § 78A-6-508(2)(c)-(d), (f).