204 P.3d 210 (2009)
2009 UT App 32
STATE of Utah, in the interest of D.H., a person under eighteen years of age.
K.H., Appellant,
v.
State of Utah, Appellee.
No. 20080057-CA.
Court of Appeals of Utah.
February 12, 2009.
*211 Lisa Lokken, Salt Lake City, and Jonathan A. Stearmer, Vernal, for Appellant.
Mark L. Shurtleff, atty. gen., and Carol L.C. Verdoia, asst. atty. gen., Salt Lake City, for Appellee.
Martha Pierce, Salt Lake City, Guardian Ad Litem.
Before THORNE, Associate P.J., BILLINGS,[1] and ORME, JJ.

OPINION
ORME, Judge:

INTRODUCTION
¶ 1 A father appeals the termination of his parental rights in his young child, claiming that the juvenile court erred in considering negligible amounts of illegal substances in his drug tests. We reject the proposition that these trace amounts of illegal substances drove the juvenile court's decision and affirm.

BACKGROUND
¶ 2 Appellant K.H. (Father) is the father of D.H. (Child), who was born in November 2005. Both Father and Child's mother used illegal drugs before and after Child was born. The Division of Child and Family Services (DCFS) filed a petition for protective services in January 2006, shortly after Child's birth. Father was incarcerated at the time the petition was filed, having been convicted of witness tampering and possession of illegal narcotics with intent to distribute. He served seven months in jail.
¶ 3 Based on the petition filed by DCFS, the juvenile court found that Child was a neglected child pursuant to Utah Code section 78-3a-103(1)(s)(i)(C), see Utah Code Ann. § 78-3a-103(1)(s)(i)(C) (Supp.2004) (current version as amended at Utah Code Ann. § 78A-6-105(25)(a)(ii), (26) (Supp. 2008)), and ordered that Child be placed under the protective supervision of DCFS while custody remained with Child's parents. The juvenile court also ordered DCFS to prepare, and Father to comply with, a family plan.
¶ 4 Between February 2006 and December 2006, Father tested positive for illegal drugs multiple times. On September 19, 2006, DCFS warned Father that it would seek custody of Child if he tested positive again. On December 1, 2006, Father tested positive for amphetamine, methamphetamine, cocaine, and opiates, in violation of his probation, and he was ordered to jail through February 2007.
¶ 5 In December 2006, DCFS filed a petition seeking custody of Child. The juvenile court found that Child was a neglected child and granted temporary custody to the State. The juvenile court further ordered DCFS to prepare a service plan designed to reunify Father with Child.
¶ 6 The DCFS service plan required, among other things, that Father submit to random urinalyses (UAs), that he remain *212 clean and sober for six months, and that he provide a stable home to which Child could return. Father called in for random UAs as required by the plan from February 2007 through July 2007, at which time Father started to forgo making the required calls to DCFS to schedule UAs. He did, however, continue to submit to UAs at the jail as part of his probation, although he never sought to make alternate testing arrangements with his DCFS caseworker. All of the tests between February 26, 2007, and August 8, 2007, were negative. Three of the twenty-one tests taken at the jail from August 18, 2007, through October 18, 2007, had abnormally low creatinine levels,[2] and many showed trace amounts of ecstasy, marijuana, cocaine, opiates, and alcohol, which amounts the testing protocol regarded as below the cutoff for a positive test result and thus to be "negative." A single test was positive for alcohol.
¶ 7 While the service plan was in effect, Father had a trial home placement with Child. During that visit, Father drank alcohol in violation of both the terms of his probation and of his reunification plan, and also borrowed a friend's car. While driving on a suspended license, Father hit a power box, fled the scene, and drove home. A police officer came to Father's home to confront him. Father falsely claimed "someone else was driving." Father was arrested and charged with driving on a revoked license, providing false information to a police officer, and two related probation violations. During this incident, Child was left at home with Father's friend. The next day, the friend took Child to an aunt's house. Father, of course, had not obtained approval from DCFS for this child care arrangement, and at no time did Father inform DCFS of the incident. Father was sentenced to eighty days in jail for his probation violations and to an additional ninety days of wearing an ankle monitor.
¶ 8 About a month prior to the vehicle incident, the State filed its petition for termination of Father's parental rights, and trial was held in December 2007. The juvenile court concluded that there were grounds for termination because Father was an unfit, incompetent parent who had neglected Child due to his substance abuse. It mentioned the UAs showing trace amounts of illicit substances along with other evidence of Father's drug habit in its analysis on this point. The juvenile court also independently determined that Father was an unfit and incompetent parent who neglected Child. This determination was based on his continued absence from Child due to his frequent incarceration andduring the times he was not in jailhis inattentiveness to Child by reason of his substance abuse problem. The juvenile court further determined that there was a separate ground warranting termination of Father's rights, i.e., that he had failed to adjust and failed to internalize the lessons that DCFS sought to teach regarding criminal conduct and substance abuse. Finally, the juvenile court determined that termination of Father's parental rights was justified because the trial home placement with Father had failed when Father engaged in criminal conduct and drank alcohol. Accordingly, Father's parental rights in Child were terminated. This appeal followed.

ISSUE AND STANDARD OF REVIEW
¶ 9 The sole issue raised by Father in this appeal is whether the juvenile court improperly relied on sub-cutoff trace amounts from Father's UAs in terminating Father's parental rights. Whether the juvenile court properly terminated Father's parental rights "presents a mixed question of law and fact." In re B.R., 2007 UT 82, ¶ 12, 171 P.3d 435. "Because of the factually intense nature of [determining unfitness], the juvenile court's decision should be afforded a high degree of deference. It is in an advantaged position with respect to the parties and the witnesses." Id. (citation and internal quotation marks omitted).

ANALYSIS
¶ 10 Utah law permits a juvenile court to terminate parental rights if it finds, *213 inter alia, neglect, parental unfitness or incompetence, failed parental adjustment, or a failed trial home placement. See Utah Code Ann. § 78A-6-507(1)(b), (c), (e), (h) (Supp. 2008).[3] Notwithstanding its reference to sub-cutoff trace amounts in Father's UAs, the juvenile court made substantial and thorough findings that set forth adequate grounds for termination wholly apart from any UA results.[4] "The statute governing termination of parental rights provides that a juvenile court `may terminate all parental rights with respect to a parent if it finds any one of' the grounds listed in the statute." In re F.C., 2003 UT App 397, ¶ 6, 81 P.3d 790 (citation omitted). Accord Utah Code Ann. § 78A-6-507(1). Here, the juvenile court entered detailed findings of fact supporting several separate grounds for termination of Father's parental rights in Child. Any one of these grounds was sufficient, by itself, to justify termination of Father's parental rights.
¶ 11 First, the juvenile court concluded that Father was an "unfit and incompetent" parent, who neglected Child, see id. § 78A-6-507(1)(b), (c), when he "ha[d] been involved in the habitual and excessive use of controlled substances and dangerous drugs that render[ed] ... [him] unable to care for the child." See generally id. § 78A-6-508(2)(c) (stating that "[i]n determining whether a parent or parents are unfit or have neglected a child the court shall consider ... habitual or excessive use of intoxicating liquors, controlled substances, or dangerous drugs that render the parent unable to care for the child"). To support this conclusion, the juvenile court's findings detail Father's extensive history of drug use and earlier positive UAs, separate and apart from those with disputed sub-cutoff levels. Further, the juvenile court listed separate reasons for finding Father unfit, incompetent, and neglectful, including that he was repeatedly absent from Child due to his incarceration and that he was inattentive to Child while under the influence of illicit substances. See id. §§ 78A-6-507(1)(b), (c), 78A-6-508(2)(c), (e). The court found that since Child's birth, Father had been incarcerated almost half of Child's life. Additionally, when Father was not in jail, he was using drugs and was therefore less attentive to Child, which contributed to Child bonding more closely to his surrogate caregivers than to Father.
¶ 12 Second, the juvenile court implicitly concluded there was a failure of parental adjustment, see id. § 78A-6-507(1)(e), as it specifically found that "[Father] has failed to overcome his drug use and criminal conduct and continues to end up in jail and [be] unavailable to care for [Child]." See id. § 78A-6-502(2) ("`Failure of parental adjustment' means that a parent or parents are unable or unwilling within a reasonable time to substantially correct the circumstances, conduct, or conditions that led to placement of their child outside of their home, notwithstanding reasonable and appropriate efforts made by the Division of Child and Family Services to return the child to that home."). Indeed, Father was incarcerated at the time of the termination trial. The court found that "[Father] has failed to internalize the lessons sought to be taught relating to avoiding drug use and criminal conduct."
¶ 13 Finally, the juvenile court found that Child's trial home placement with Father had *214 failed. See id. § 78A-6-507(1)(h). The court found that when Child was returned home to Father, "[F]ather drank alcohol in violation of [his] probation," "dr[ove] on a revoked license, l[ied] to a police officer," left Child with a non-DCFS-approved caregiver, and was returned to jail for probation violations. Contrary to Father's suggestion that the juvenile court's decision is best explained by its preoccupation with trace amounts of illegal substances, see supra note 4, the trial court even acknowledged that Father "ha[d] made substantial progress on his drug problem." The court nonetheless found that "[Father] still engaged in criminal conduct and thinking, lying to get out of trouble and getting himself jailed and [becoming] unable to care for his child."

CONCLUSION
¶ 14 Even if the juvenile court erred in considering the UAs that showed trace amounts of illegal substances, we conclude that its order terminating parental rights is sustainable because several separate grounds supported termination. While the trial court mentioned Father's drug habit in its discussion of why Father's absence from Child and his failure to internalize the lessons sought to be taught supported termination, it did not mention the UAs showing trace levels in this context. Moreover, independent of Father's drug habit, his repeated criminal activity and ensuing incarcerations support the conclusion that his absence from Child made him an unfit or incompetent parent. Finally, the failed home trial placement is itself an adequate ground on which to terminate Father's parental rights.
¶ 15 Affirmed.
¶ 16 WE CONCUR: WILLIAM A. THORNE JR., Associate Presiding Judge, and JUDITH M. BILLINGS, Judge.
NOTES
[1] Judge Billings, who retired on December 31, 2008, participated in resolving this appeal and voted to concur in this opinion prior to her retirement.
[2] In briefing and at oral argument, counsel explained that low creatinine levels in a drug test might indicate that the subject was "flushing," i.e., drinking large quantities of water to dilute the sample.
[3] For the reader's convenience, we cite to the current version of Title 78, recodified as Title 78A, unless otherwise noted.
[4] Father claims that the juvenile court should only have considered the positive or negative results of his UAs, not evidence of trace amounts of illegal drugs. He therefore contends that the court improperly terminated his parental rights because its findings of fact and conclusions of law were tainted by its focus on sub-cutoff trace amounts in drug tests, but he does not challenge the sufficiency of the evidence as such. We see not so much as a hint that the juvenile court's other findings would have been different in any respect if the court had not been aware that the UAs revealed trace amounts of illicit substances, albeit in amounts that the testing lab regarded as negative. Accordingly, we affirm the juvenile court's decision without reaching the issue pressed by Father. We note that the issue is a troubling one, given thatat least according to counseltesting protocols are not standardized and what levels of which substances will be regarded as "positive," "negative," or "trace" varies from lab to lab. Suffice it to say that if DCFS establishes a treatment plan, and it intends to make drug testing a requirement, it ought to be specific about what the test results must be and should avoid generalized terminology such as "positive" and "negative."