IN THE UTAH COURT OF APPEALS

----ooOoo----

| | | |
|---|---|---|
| State of Utah, in the interest of S.F. and C.F., persons under eighteen years of age.<br>_____ | ) ) ) ) ) | AMENDED OPINION[1]<br><br>Case No. 20090484-CA |
| K.F., | ) ) | F I L E D |
| Appellant, | ) ) | (January 12, 2012) |
| v. | ) ) | 2012 UT App 10 |
| State of Utah, | ) ) | |
| Appellee. | ) | |

-----

Fourth District Juvenile, Orem Department, 535184
The Honorable Mary T. Noonan

Attorneys:      Neil D. Skousen, Orem, for Appellant
                Mark L. Shurtleff and John M. Peterson, Salt Lake City, for Appellee
                Martha Pierce, Salt Lake City, Guardian ad Litem

-----

Before Judges Orme, Roth, and Christiansen.

CHRISTIANSEN, Judge:

¶1      K.F. (Father) appeals the juvenile court order terminating his parental rights to his children, S.F. and C.F. (the Children). Father argues that in failing to comply with

---

1. This Amended Opinion replaces our Opinion in Case No. 20090484-CA issued on November 10, 2011. We add the word "temporary" before "custody" in paragraph 47. Our opinion is otherwise unchanged.

the Juvenile Court Act of 1996 after the Children were returned to the Division of Child and Family Services' (DCFS) custody for the second time, the juvenile court exceeded its jurisdiction and violated his due process rights. *See* Utah Code Ann. §§ 78A-6-101 to -1210 (2008).[2] Father also argues that the State presented insufficient evidence to support the termination of his parental rights. We affirm.

BACKGROUND[3]

¶2    Father and H.F. (Mother), who is now deceased,[4] are the biological parents of S.F., who was born in 2003, and C.F., who was born in 2006. The Children were placed in DCFS's protective custody on August 14, 2007. At a hearing on October 9, 2007, the parents stipulated to certain factual findings, thereby allowing the juvenile court to adjudicate the Children as neglected. Based upon this finding of neglect, the juvenile court ordered DCFS to continue its custody and guardianship of the Children in an out-of-home placement. Specifically, the court entered the following conclusions of law:

> Pursuant to Utah Code Ann. § [78A-6-105(25)(a) (2008)], the [C]hildren . . . are neglected in that [they] have been subjected to mistreatment . . . ; the [C]hildren lack proper parental care by reason of the fault or habits of [M]other and [Father]; [M]other and [Father] fail or refuse to provide the necessary or proper subsistence, education, medical care, or any other care necessary for the health, safety and well being of the [C]hildren; and the [C]hildren are at risk of being

---

[2]Because substantive changes have been made to the Juvenile Court Act of 1996 since 2008, *see generally* Utah Code Ann. §§ 78A-6-101 to -1210 (Supp. 2011), throughout this opinion we cite and rely on the version in effect in 2008. *See id.* §§ 78A-6-101 to -1210 (2008).

[3]"Because the termination of parental rights is fact sensitive, we review the facts of the controversy in detail." *In re A.H.*, 2004 UT App 39, ¶ 1 n.1, 86 P.3d 745 (internal quotation marks omitted).

[4]Mother died June 13, 2009.

abused and/or neglected because another minor in the home
has been abused and/or neglected.[5]

¶3    The court entered a dispositional order on November 1, 2007, ordering DCFS to provide reunification services to Father and Mother for twelve months as to S.F. and eight months as to C.F. The court also approved a service plan, which required Father and Mother to submit to psychological and parental fitness evaluations, participate in family therapy and parenting classes, regularly visit with the Children, maintain stable and appropriate housing, and maintain a legitimate means for providing for the Children. At the first permanency hearing on April 1, 2008, the court determined that the permanency goal for the Children would be reunification with Father. At several subsequent permanency hearings, the court renewed this permanency goal for Father.[6]

I. August 12, 2008 Permanency Hearing

¶4    At the August 12, 2008 permanency hearing, the juvenile court returned custody and guardianship of the Children to Father. The court found that Father, "substantially complied with the treatment plan, reunification of the [C]hildren [with Father] is probable, and extension of services is in the best interest of the [C]hildren." The court further found, "[I]t is safe [and] appropriate to return [the C]hildren to . . . Father. . . . Father has substantially complied with the service plan goals." The court modified its

---

[5]These conclusions of law also applied to two other children, J.G. and E.M., stepchildren of Father and biological children of Mother, who were also placed in DCFS's protective custody on August 14, 2007. In addition to the findings of neglect, J.G. and E.M. were adjudicated as physically and emotionally abused by Mother and Father. The subsequent determinations regarding J.G. and E.M. are not relevant for the purposes of this appeal.

[6]On June 30, 2008, the court terminated reunification services as to Mother. The court found that Mother had not fulfilled her responsibilities according to the service plan, that she violated the order allowing only supervised contact with the Children, that she was "pink slipped" into the hospital more than once, and that she engaged in numerous physical and verbal domestic violence incidents in which she hit, bit, or otherwise attempted to harm Father, at times in the Children's presence. Following the termination trial, Mother's parental rights were ultimately terminated along with Father's.

order for custody and guardianship from DCFS to Father, specifically stating, "Custody and guardianship of [the Children] is restored to . . . Father, . . . subject to protective supervision by DCFS, effective Friday, Aug[ust] 15, 2008, no later than midnight." Additionally, the court stated,

> Dad, I am returning physical and legal custody to you today by court order. The responsibility that you have to the [c]ourt and to the kids remains in place to keep them safe, and to continue to work with the agency on . . . an in-home plan, because they'll be at home rather than out of home.

The court ordered DCFS to create a new service plan and scheduled a review hearing on November 7, 2008. The court also emphasized, "[W]hat we'll be looking for when next we're in court is [to] see how you're doing with the kids at home [and] to answer any questions that there might be under the new service plan . . . ." At the end of the hearing, the court added, "[On] November 7th we'll be back in court to check on everybody's progress, see how the school year is going, see how daycare is going, visitation and the like." On September 25, 2008, Father agreed to a service plan that included ensuring that Mother would have only authorized contact with the Children and would not enter the family home.[7]

## II. November 3, 2008 Hearing

¶5     Just one month after Father entered into the service plan on October 27, 2008, law enforcement officers responded to two separate incidents of domestic violence involving both parents at Father's home. On November 3, 2008, the juvenile court held a hearing on DCFS's October 30, 2008 Motion for Expedited Placement in Temporary Custody and Verified Petition for Expedited Custody. After receiving the responding officers' testimonies, the court found that Father's

> confrontation of [M]other was an inappropriate response. Given the history, [F]ather should have backed out of the home and called the police immediately and sought redress in that manner. Father should have kept the [C]hildren

---

[7]Mother was permitted only supervised visitation as recommended by DCFS, the guardian ad litem, and Mother's therapists.

completely protected, and his actions are not consistent with the protection of these [C]hildren.

¶6    As to the incident that occurred later on October 27, the court found that Father

told law enforcement that he had observed [M]other damaging his car and he confronted her. [F]ather again chose to confront [M]other about the damage to the car, subjecting the [C]hildren to exposure to further harmful violent behavior on the part of the parents. The [C]hildren were in the home during this incident. There was yelling between the parents.

¶7    On a state-provided shelter order form entitled "Custody Hearing Findings and Order," the court concluded, "[Father's] . . . actions, omissions, or habitual action create an environment that poses a threat to the child's health or safety . . . ." *See* Utah Code Ann. § 78A-6-302(1)(a) (2008). The court therefore ordered that removal was necessary and that it was in the Children's best interests "to be placed in the temporary legal custody of [DCFS] for continued care and placement pending the adjudication hearing."[8] The court also concluded, by clear and convincing evidence, that it was appropriate for the Children to be removed from Father's custody because "the conduct between the parents continues to place these [C]hildren in danger." The court also ordered that there should be "[n]o contact between the parents from now [until] further order of the [c]ourt."

¶8    Father stipulated to the removal of the Children and stipulated to the majority of the facts DCFS presented in its Verified Petition for Expedited Custody and at the hearing. But Father contested the State's new factual allegations that relied on Mother's credibility, and he argued at the hearing that the court should not base any of its findings on Mother's version of the October 27 events. The court recognized that while "[n]ot every allegation in the petition has been addressed[] as an evidentiary matter," "the parents' conduct continue[d] to place the [C]hildren in danger" and, thus, it was appropriate to remove them from Father's custody. As to "[t]he rest of the factual

_____

[8]The court amended this order on May 27, 2009, after the termination trial, with more comprehensive findings consistent with the transcript of the hearing.

allegations in the petition, the [c]ourt . . . refer[red the parents] to mediation and second pretrial [hearing]," which the court scheduled on December 2, 2008.

¶9    At the December 2, 2008 pretrial hearing, the court denied Father's request for oral argument on whether reunification could be extended because Father had not yet filed the required motion. But the court scheduled a hearing on December 8, 2008, in anticipation of Father's filing of a written motion for reunification services. Additionally, the court scheduled a trial on the State's Petition for Termination of Parental Rights, which the State had filed at the pretrial hearing. At the December 2 hearing, Father's counsel confirmed, "[M]y understanding is . . . that we [a]re going to have an opportunity to try to argue for reunification services prior to going forward with the [termination of parental rights]."

### III.  December 8, 2008 Hearing

¶10    In Father's Motion for Reunification Services and at the December 8, 2008 hearing, Father argued that reunification services were justified because, among other reasons, he recognized that he needed to place the Children's welfare and safety first and to obey the court's no-contact order with Mother. Father conceded that he violated the service plan, which was grounds for not offering reunification services. However, he urged the juvenile court to give him a second chance and to consider his positive accomplishments and the Children's best interests. Father stated, "In light of the [C]hildren's obvious strong bond to [me], it would be in the [C]hildren's best interests to order reunification services and to not terminate [my] parental rights."[9] According to Father, the Children's bond was demonstrated by the caseworker's opinion that "[t]he [C]hildren were very excited to see their father" at a supervised visit, "mak[ing] it very

---

[9]After arguing these points at the December 8 hearing, Father's counsel acknowledged that the court might believe these issues could be reserved for the termination trial, yet he reasoned,

> [I]f it's in the best interests of the [C]hildren on the reunification issue . . . the [c]ourt should use its discretion to give [Father] one last chance to demonstrate that he can protect the [C]hildren . . . because in my view of the statute and this case . . . if the [c]ourt does not order the [S]tate to offer reunification services, then of course we're on a track for termination of parental rights.

clear that [Father] is worthy of one more chance to demonstrate . . . that he can protect [and] that he can keep Mom out of the picture." Father also argued that he had a constitutionally-protected liberty interest in the Children that included a right to correct his shortcomings during reunification services. Finally, Father represented that Mother had attempted to sabotage Father's successful compliance with the service plan.

¶11 The court inquired of Father whether he had taken any measures to dissolve his marriage, and Father's counsel responded that he did not believe anything had been filed. The court also questioned Father about his admitted shortcomings, and Father's counsel responded that one of Father's shortcomings was the October 27 domestic violence incident that occurred in front of S.F.

¶12 The court also inquired of Father and the State how many times it had previously adjudicated the Children as neglected. Father's counsel replied that it was at least once. The State responded that the court had adjudicated the Children as neglected by Father after they were removed in August 2007 and again after they were returned to DCFS's custody in November 2008. The State contended that no further adjudication was needed because the court had made factual findings that the majority of the State's allegations in its Verified Petition for Expedited Custody were supported by clear and convincing evidence.

¶13 Although acknowledging the Children's bond with Father, the court denied reunification services pursuant to Utah Code section 78A-6-312. *See* Utah Code Ann. § 78A-6-312(3)(d)(i)(K) (2008) (stating that there is a presumption that reunification services should be denied if the court finds, by clear and convincing evidence, any circumstance it "determines should preclude reunification efforts or services"); *id.* § 78A-6-312(4)(a), (c)-(e) (stating that in determining the appropriateness of reunification services, the court shall consider, inter alia, "failure of the parent to respond to previous services or comply with a previous child and family plan," "any history of violent behavior directed at the child or an immediate family member," "whether a parent continues to live with an individual who abused the minor," and "any patterns of the parent's behavior that have exposed the minor to repeated abuse"). During the hearing, the court acknowledged, "[F]ather does have difficult choices to . . . ma[k]e. However, his primary and only and principal concern with respect to this [c]ourt's order on reunification is [F]ather's responsibility to put the [C]hildren first at all times. . . . [T]hat message has been delivered on multiple occasions to [F]ather, and unequivocally delivered." The court continued,

The bottom line is that the parents have a volatile relationship. The parents have behaved aggressively with one another and in the presence of the [C]hildren on more than one occasion. The parents remain married. The parents are apparently committed to that union. That union, by definition, puts the [C]hildren at risk.

[F]ather, it appears to the [c]ourt, is either unwilling or unable to give up that relationship, . . . nor does he indicate today that he intends to.

In addition, it is clear that [F]ather is either unwilling or unable to put the [C]hildren first. These [C]hildren are so young. They deserve permanency in a safe and appropriate family. The law allows, in fact requires, that this [c]ourt make every effort to [e]nsure that they grow up in a safe and appropriate home.

¶14 In denying further reunification services to Father, the court also considered that DCFS had already provided reunification services for one year, which included evaluations, individual and family counseling for Father and the Children, parenting classes, and visitation services for Father and the Children. Additionally, the court considered that the family had received protective supervision services between August and October 2008. The court concluded, "There are no additional services that can be pulled out of the hat at this point in time to address the concerns that remain rather static and rather constant across all the months that this [c]ourt has had jurisdiction." At the end of the hearing, Father declined a pretrial hearing and mediation and stated that he instead "just want[ed] to go straight to trial."

### IV. January 8, 2009 Order To Lift the No-Contact Order

¶15 On December 22, 2008, Father moved the court to lift or modify the no-contact order between him and Mother, arguing that "he [would] be disadvantaged at trial if he [could] not work with [M]other . . . to improve their marital relationship generally, to attend couples counseling and other therapeutic settings, and attend church services together." In recognition that this case was proceeding to the termination stage, Father also asserted that he was prepared to offer evidence at trial from his LDS bishop and an LDS Social Services therapist "to demonstrate the need to preserve the family relationship and to not terminate parental rights." Neither the guardian ad litem (GAL)

nor the State opposed Father's motion to lift the no-contact order. As a result, the court lifted its no-contact order on January 8, 2009.

## V. Termination Trial

¶16     The case proceeded to a three-day trial on the termination of Father's and Mother's parental rights, which began February 3, 2009, and concluded March 3. At the close of the State's evidence, Father and Mother jointly moved the juvenile court for a directed verdict, arguing that the State had failed to meet its burden of showing that termination was in the Children's best interests. The court denied the motion and ultimately terminated Father's parental rights. The court found,

> [F]ather fail[ed] to recognize [M]other's mental health issues and how these issues have negatively affected the [C]hildren or his relationship with [M]other. [F]ather testified that [M]other's mental health issues do not affect their relationship and further testified that [M]other has no mental health issues as of the date of trial. [F]ather clearly has chosen to stay with [M]other and continue their relationship even though this [c]ourt found that [M]other had failed to substantially comply with the DCFS service plan at [her] permanency trial in June 2008 and is still not in substantial compliance.

¶17     Additionally, the court found,

> [F]rom the Spring of 2008 through the Autumn of 2008, there have been approximately eight . . . separate domestic violence incidents between the parents which have required police involvement. The [C]hildren have been present for some of these incidents and were aware of other incidents. The [c]ourt finds these domestic violence incidents severe in nature. . . . The parents fail to recognize the negative impact that these domestic violence incidents have on the [C]hildren or the risk to these [C]hildren as a result.

¶18     With regard to the return of custody to Father and subsequent domestic violence incidents, the court found,

> In August 2008, the [c]ourt made it very clear that there would be no contact between [M]other and the [C]hildren and [F]ather understood he had the duty to protect and enforce the [c]ourt's order. [F]ather committed to the [c]ourt that he would place the [C]hildren first; however, that commitment was extremely short lived. [F]ather failed to protect and willfully violated this [c]ourt's order a mere 12 weeks later. [F]ather willfully imposed his ideas over what, in fact, was safe for the [C]hildren and over the specific needs of the [C]hildren to be protected.

¶19     The court also found that the parents had violated the court's November 3, 2008 no-contact order.

> [I]mmediately after [the November 3] hearing, the parents had contact and in fact, another domestic violence incident ensued. [M]other either jumped out of the car or was pushed by [F]ather, although law enforcement indicated after looking at the car, it would have been difficult for [F]ather to accomplish this. Again, the parents willfully chose to violate this [c]ourt's order. Again, [M]other chose to engage in this type of behavior and [F]ather chose to confront or deal with [M]other, rather than walking away from the car and seeking assistance from the police station, which was within walking distance. [F]ather testified that he felt there was no danger so he attempted to drive [with Mother in the car] to the police station, even though there had been [two] domestic violence incidents less than one week previous.

¶20     The court based its termination of Father's parental rights on the following grounds: first, Father neglected the Children, *see* Utah Code Ann. § 78A-6-507(1)(b) (2008); second, Father was an unfit or incompetent parent, *see id.* § 78A-6-507(1)(c); third, the Children were being cared for in an out-of-home placement and Father

"substantially neglected, willfully refused, or [was] unable or unwilling to remedy the circumstances that cause[d] the [C]hildren to be in an out-of-home placement, and there [was] a substantial likelihood that [he would] not be capable of exercising proper and effective parental care in the near future," *see id.* § 78A-6-507(1)(d); and fourth, Father failed to make parental adjustments, *see id.* § 78A-6-507(1)(e). The court also considered that Father was unfit and had "neglected his [C]hildren due to [the parents'] history of violent behavior throughout the pendency of this case." *See generally id.* § 78A-6-508(2)(f). Finally, the court concluded it was in the Children's best interests that Father's parental rights be terminated. *See id.* § 78A-6-503(2).

## VI. Father's Rule 59 Motion and the Juvenile Court's Amendment of Prior Orders

¶21 On June 5, 2009, Father moved the juvenile court to order a new trial or to amend the order terminating his parental rights under rule 59 of the Utah Rules of Civil Procedure (rule 59 motion). *See* Utah R. Civ. P. 59(a)(1) (providing for a new trial where the court proceedings were irregular); *id*. R. 59(a)(7) (providing for a new trial where the court committed a legal error). Father argued that he was entitled to a new permanency hearing after the State "removed" the Children for a second time in November 2008. He asserted that the December 8 hearing on his motion for reunification services was solely a dispositional hearing, and not a concurrent, statutorily-mandated permanency hearing, because the permanency hearing must be held within thirty days *after* the dispositional hearing if reunification services are not ordered. *See* Utah Code Ann. § 78A-6-314(1)(b). In addition, Father argued, the State filed its Petition for Termination of Parental Rights six days before the purported permanency hearing when, by statute, such a petition must be filed within forty-five days *after* the permanency hearing. *See id.* § 78A-6-314(5). Even though Father conceded that it is statutorily permissible for "the court [to] consolidate the hearing on termination of parental rights with the permanency hearing" when a termination petition is filed prior to the permanency hearing, *see id.* § 78A-6-314(8)(a), he argued that the court did not consolidate the permanency hearing with the termination trial. Father concluded that the court's failure to hold a permanency hearing as required by the statute violated his right to due process.

¶22 After Father filed his rule 59 motion, the court amended two of its previous orders. On June 30, 2009, the court amended its May 27, 2009 Order on Reunification, retitling it "Amended Order on Reunification and Permanency Order" and adding a

finding of fact that stated, "Pursuant to Utah Code Ann. § 78A-6-314, continuation in, or return to, the home would be contrary to the welfare of the Children. Return of the Children to the home would create a substantial risk of detriment to the Children's physical or emotional well-being." On July 15, 2009, the court also amended its May 27, 2009 Termination of Parental Rights, Findings of Fact, Conclusions of Law, and Order by adding the following finding of fact:

> [O]n December 8, 2008 at the disposition/permanency hearing, this [c]ourt found that reunification services were not appropriate to [F]ather. Specifically, this [c]ourt found that the static and constant issue in this case has been the volatile relationship between the parents. They have behaved aggressively with one another and in front of the [C]hildren. They remain married and that union places the [C]hildren at risk. [F]ather is unable or unwilling to give up that relationship nor does he intend to as of today's hearing. [F]ather is not able or not willing to put the [C]hildren and their needs first. The [C]hildren need permanency and a safe and appropriate environment. The appropriate goal at this time is adoption. The matter was set for trial on the State's Petition to Terminate Parental Rights.

¶23    The court denied the portion of Father's rule 59 motion that was grounded on rule 59(a)(1) because Father failed to file an affidavit, as required by the rule. *See* Utah R. Civ. P. 59(c) ("When the application for a new trial is made under Subdivision (a)(1) . . . it shall be supported by affidavit."). After considering whether it had committed an error of law, the court concluded that, even though the resulting May 27, 2009 Order was termed "Order on Reunification," the December 8 hearing was, in effect, both a dispositional and a permanency hearing. The court determined that its original Order on Reunification addressed permanency issues, such as its conclusions that "the [C]hildren cannot safely return to the parents' custody," and that "adoption is the most appropriate goal." Additionally, the court pointed out that in Father's Motion for Reunification Services and at the December 8 hearing, he raised many of the facts he claims he was not afforded the opportunity to present due to the court's failure to hold a permanency hearing—for instance, his positive actions in securing housing and exercising safe and proper visitation. The court also determined that Father had

presented his argument that it was in the Children's best interests for the court to order reunification services and to not terminate his parental rights.

ISSUES AND STANDARDS OF REVIEW

¶24    Father appeals the juvenile court's orders terminating reunification services, denying his directed verdict motion, terminating his parental rights, and denying his rule 59 motion. Father's central argument on appeal is that, in failing to hold statutorily-mandated child welfare proceedings, the juvenile court exceeded its subject matter jurisdiction and violated his due process rights. Much of Father's due process argument relies on his contention that the Children's return to DCFS's custody in November 2008 required the juvenile court to adjudicate the Children again in order to obtain jurisdiction over the Children. "Whether a parent has been afforded adequate due process is a question of law, reviewed for correctness." *In re A.H.*, 2004 UT App 39, ¶ 8, 86 P.3d 745 (internal quotation marks omitted). In addition to resolving the issue of the adequacy of the process provided to Father, we must determine whether the juvenile court had subject matter jurisdiction, which we also review for correctness. *See In re K.F.*, 2009 UT 4, ¶ 18, 201 P.3d 985. Likewise, any interpretation of the Juvenile Court Act is a question of law, reviewed for correctness. *See In re J.H.*, 2006 UT App 205, ¶ 5, 138 P.3d 70.

¶25    Father also argues that there was insufficient evidence to support terminating his parental rights. "Whether a parent's rights should be terminated presents a mixed question of law and fact." *In re B.R.*, 2007 UT 82, ¶ 12, 171 P.3d 435. Termination decisions "rely heavily on the juvenile court's assessment and weighing of the facts in any given case. Because of the factually intense nature of such an inquiry, the juvenile court's decision should be afforded a high degree of deference." *Id.* "Thus, in order to overturn the juvenile court's decision the result must be against the clear weight of the evidence or leave the appellate court with a firm and definite conviction that a mistake has been made." *Id.* (internal quotation marks omitted).

ANALYSIS

I. This Court Has Jurisdiction To Consider Father's Appeal

¶26    As a preliminary matter, we address the GAL's contention that this court does not have jurisdiction to hear Father's appeal concerning any issue other than the sufficiency of the evidence issue arising from the termination trial.  The Utah Rules of Appellate Procedure allow a party to "appeal from all final orders and judgments." Utah R. App. P. 3(a).  Our supreme court has explained that, "[i]n the child welfare arena," "[t]he question of whether an order is final and appealable is determined by the 'substance and effect' of the order" and "the determining factor in deciding if an order is final and appealable is whether it effects a change in the permanent status of the child." *In re A.F.*, 2007 UT 69, ¶ 3, 167 P.3d 1070.  The GAL asserts that we lack jurisdiction to review the juvenile court's decisions made after the Children were returned to DCFS's custody in November 2008 because Father did not appeal from any of those decisions and has thus waived his right to seek review of those decisions.  We disagree.

¶27    In child welfare proceedings such as these, a final order "is one that ends the current juvenile proceedings, leaving no question open for further judicial action." *In re M.W.*, 2000 UT 79, ¶ 25, 12 P.3d 80 (internal quotation marks omitted).  But here, none of the court's interim determinations or its alleged failure to hold required proceedings that Father claims violated his due process rights resulted in the issuance of any final, appealable orders.  From the point that the court restored custody of the Children to DCFS in November 2008 until it terminated Father's parental rights, the juvenile court made only interim determinations regarding the Children.  Specifically, as we explain in greater detail below, the November 3 hearing was not adjudicatory.  *See In re S.A.K.*, 2003 UT App 87, ¶ 13, 67 P.3d 1037 (explaining that an adjudication order is one example of a final, appealable order in a juvenile proceeding).  Likewise, the court's determination on December 8 denying Father continued reunification services did not result in the entry of a final permanency order.  *See In re A.F.*, 2007 UT 69, ¶¶ 6-7 (discussing instances when a permanency hearing results in a final order and concluding that "[t]he order terminating reunification services and changing the permanency goal left the Child's status unchanged and unresolved and therefore was not a final determination of the Mother's rights or the Child's status").

¶28    Moreover, under the unique circumstances of this case, the juvenile court's termination of Father's parental rights is the only final order following the Children's return to DCFS's custody from which Father could appeal.  Because the rulings resulting from the November 3 and December 8 hearings were not final, appealable orders, Father was not required to appeal them under rule 3 of the Utah Rules of Appellate Procedure, *see* Utah R. App. P. 3(a), and the fact that he could have elected to petition for interlocutory appeal, *see id.* R. 5, does not eliminate our authority to review those decisions once the neglect and termination proceedings were completed and an appeal timely filed.  Contrary to the GAL's contention, Father's failure to petition for interlocutory appeal does not limit either his ability to later appeal these issues or our jurisdiction to consider these issues.  *See State v. Troyer*, 866 P.2d 528, 530 (Utah 1993) ("In no other instance, in either civil or criminal appellate procedure, is the scope of appellate review from a final judgment in any way affected or limited because of the possibility that any one or more of the trial court's rulings might have formed the basis of a petition for an interlocutory appeal.  In other words, the scope of a statutory appeal of right at the end of the case should not be affected or diminished by the possibility of an earlier discretionary appeal.").  Accordingly, we have jurisdiction to determine whether the juvenile court exceeded its jurisdiction and violated Father's due process rights by failing to follow the statutorily-mandated child welfare proceedings.

## II.  The Juvenile Court Had Continuing Jurisdiction and Father's Due Process Rights Were Not Violated

¶29    Father complains that in failing to strictly comply with the statutory process set forth in the Juvenile Court Act, the juvenile court exceeded its subject matter jurisdiction and violated his due process rights.  Utah law clearly establishes that parents have a fundamental liberty interest in their children, protected under the due process clause.  *See* Utah Code Ann. § 62A-4a-201(1)(a) (2006) ("Under both the United States Constitution and the constitution of this state, a parent possesses a fundamental liberty interest in the care, custody, and management of the parent's children."); *In re A.H.*, 2004 UT App 39, ¶ 10, 86 P.3d 745 ("It is widely recognized that [a] parent has a fundamental right, protected by the Constitution, to sustain his relationship with his child." (alteration in original) (internal quotation marks omitted)).  "Thus, parties to a judicial proceeding are entitled to notice that a particular issue is being considered by a court and must be given an opportunity to present evidence and argument on that issue before decision." *In re A.H.*, 2004 UT App 39, ¶ 11 (internal quotation marks omitted).

And "[j]udicial and administrative proceedings following the State's removal of children from their home are no exception to this fundamental principle." *Id.* ¶ 12.

¶30     We determine that, although the juvenile court could have more clearly articulated for the parties where they were in the proceedings, the court properly followed the statutory child welfare proceedings after the Children were returned to DCFS's custody for the second time and provided Father with sufficient notice of the issues and the appropriate opportunity to argue that his parental rights should not be terminated. Thus, we cannot say that the juvenile court exceeded its subject matter jurisdiction or violated Father's due process rights.

A. The Juvenile Court Did Not Surrender Its Subject Matter Jurisdiction When It Restored Legal Custody to Father in August 2008.

¶31     The parties do not dispute that the juvenile court's exclusive, original subject matter jurisdiction in this case began with the October 9, 2007 adjudication, at which the parents stipulated to the court's findings supporting its conclusion that the Children were neglected. *See generally* Utah Code Ann. § 78A-6-103(1)(c) (2008) ("[T]he juvenile court has exclusive original jurisdiction in proceedings concerning . . . a child who is an abused child, neglected child, or dependent child . . . ."). Father argues that the juvenile court exceeded its jurisdiction after it failed to adjudicate the Children again when they were returned to DCFS's custody in November 2008. We address Father's contention in the next section, *infra* ¶¶ 37-53. Before we reach this issue, however, we must determine whether the juvenile court retained jurisdiction after the August 2008 permanency hearing when it returned custody of the Children to Father, or whether returning custody to Father terminated the court's jurisdiction over the Children.

¶32     Father argues, and we agree, that the court intended to return permanent, legal custody to him and not to merely provide a trial home placement in August 2008. *Cf.* Utah Code Ann. § 78A-6-507(1)(h) (allowing the court to terminate parental rights following a trial home placement, i.e., "a period of trial during which the child was returned to live in the child's own home"). The State and GAL also agree with Father that the court restored legal custody to Father in August 2008, but they assert that the court did not terminate its jurisdiction by making a *final* custody determination regarding the Children because the order was conditioned on Father keeping the

Children safe and away from Mother.[10]  The State and GAL thus assert that the juvenile court did not surrender its jurisdiction as a result of the August 2008 permanency hearing.[11]

¶33    We conclude that although the court returned legal custody to Father in August 2008, the court retained subject matter jurisdiction and its dispositional authority over the Children.  Returning custody of the Children to Father did not amend the legal status of the Children as neglected.  Importantly, once a child has been adjudicated as neglected, the juvenile court has continuing jurisdiction over the child until he or she turns twenty-one, unless it terminates its jurisdiction by "order of the court."  *See id.* § 78A-6-120(1), (2)(a)(i).  In fact, a juvenile court's jurisdiction often continues in spite of its entry of a final and appealable order.  *See In re S.M.*, 2007 UT 21, ¶ 18, 154 P.3d 835 ("Because considerations regarding a child's welfare are rarely, if ever, static and because the child's environment is constantly evolving, the juvenile court frequently retains jurisdiction over cases after some of the issues have been finally resolved." (internal quotation marks omitted)).  As our supreme court has observed, "[T]he court is under a statutory mandate to retain jurisdiction over a child who is the subject of . . . neglect."  *In re M.W.*, 2000 UT 79, ¶ 26 n.9, 12 P.3d 80.

¶34    Thus, as long as the juvenile court does not dismiss the case or terminate jurisdiction, the court retains dispositional authority over the Children because there has been an initial legal determination that those Children are abused, neglected, or dependent.  *See* Utah Code Ann. § 78A-6-103(1)(c).  In contrast, where the juvenile court makes a ruling incompatible with a continuation of its authority, the court's jurisdiction ends.  For example, in *In re B.B.*, 2002 UT App 82, 45 P.3d 527, *aff'd*, 2004 UT 39, 94 P.2d 252, the adoptive parents argued that the juvenile court lacked jurisdiction to enforce a preadoption order allowing certain visitation to the biological grandparents that was not ordered in the adoption decree.  *See id.* ¶¶ 1-2, 5.  This court determined that once the juvenile court granted the adoption petition, it lost its jurisdiction to enforce the

---

[10]The GAL specifically argues that Father was given "conditional custody" within the court's "dispositional jurisdiction."

[11]Father does not necessarily disagree that the court retained its jurisdiction after it restored legal custody to him in August 2008.  Rather, Father contends that the juvenile court exceeded its jurisdiction after it failed to again adjudicate the Children as neglected when they were returned to DCFS's custody in November 2008.

preadoption order because the adoption itself permanently altered the child's status. *See id*. ¶¶ 15-16. "[T]he original basis for jurisdiction over [the child] ceased to exist because [the child] was no longer an abused or neglected child and permanency had been achieved." *Id*. ¶ 12.

¶35 Despite returning the Children to Father's legal custody at the August 2008 permanency hearing, the court continued its authority and jurisdiction over the Children, and the Children's return to Father's legal custody did not alter their status as neglected. This is clear from the court's order, which anticipated continued protective supervision services by DCFS. As part of those continued services and consistent with the court's statements at the hearing, Father entered into a service plan on or about September 25, 2008. This new plan included responsibilities for Father such as ensuring that Mother have only authorized contact with the Children and that Mother not have unauthorized entry into the family home. The court also scheduled a review hearing in ninety days to check the status of the protective supervision services it had ordered.

¶36 At the anticipated review hearing, if Father had complied with the service plan, the court may have finally disposed of the case and terminated its jurisdiction. *See, e.g.*, *In re A.H.*, 2009 UT App 232, ¶¶ 2-3, 217 P.3d 278 (explaining that the juvenile court retained jurisdiction while DCFS provided protective supervision and completed the reports to release the children from the court's jurisdiction); *In re P.F.B.*, 2008 UT App 271, ¶ 3, 191 P.3d 49 (reviewing a case in which the juvenile court retained jurisdiction until it terminated DCFS's protective supervision services and the guardian ad litem's services). However, Father did not comply with the service plan. And because the court did not affirmatively renounce its jurisdiction or enter any ruling incompatible with its continuing authority, it clearly retained jurisdiction over the Children.

B. The Child Welfare Proceedings Did Not Start Over When the Court Returned the Children To DCFS's Custody in November 2008.

¶37 Father argues that any time a child is removed from a parent's legal custody, the Juvenile Court Act requires the juvenile court to adjudicate that child as to neglect, abuse, or dependency regardless of whether the court has previously done so. As such, he argues that parents with *legal* custody are entitled to the full procedural protections under the Juvenile Court Act at the time of any removal regardless of whether the juvenile court has ongoing jurisdiction.

¶38    Therefore, according to Father, the juvenile court was required to timely comply with all procedures mandated by the Juvenile Court Act when the State filed its Motion for Expedited Placement in Temporary Custody and Verified Petition for Expedited Custody on October 30, 2008.  Because he had regained legal custody as of August 2008, he contends that when the Children were later "removed" from his custody, i.e., returned to DCFS's custody, in November 2008, the Juvenile Court Act mandated the commencement of new child welfare proceedings.  Father asserts that after the court failed to again adjudicate the Children as to neglect, abuse, or dependency when they were returned to DCFS's custody in November 2008, the court exceeded its subject matter jurisdiction and violated his due process rights by considering the State's petition for termination of Father's parental rights.  Father also seems to imply that the court violated his due process rights when it denied him another year of reunification services.  He argues that because new child welfare proceedings were initiated after November 2008, he became eligible to receive another year of reunification services.  Finally, Father argues that the juvenile court failed to hold a permanency hearing because the December 8 hearing was scheduled only to hear his motion for reunification services.

¶39    Based upon the factual findings in its original order, it appears that the juvenile court incorrectly intended that the child welfare proceedings start over in this case in November 2008.  However, we determine that the court was not required to restart the neglect proceedings in the particular circumstances of this case.  Consequently, Father was not denied his due process rights.  We will first explain our conclusion that because the court retained its jurisdiction, and therefore its dispositional authority over the Children, the Juvenile Court Act did not require the court to restart the proceedings.  As part of that discussion, we will also address why Father was not entitled to another adjudication hearing, renewed reunification services, or another permanency hearing.

1.    The Juvenile Court's Dispositional Authority

¶40    Father contends that the court never adjudicated the Children again after they were "removed" in November 2008 and that the November 3 hearing was a shelter hearing, as opposed to an adjudication hearing.  In support of this proposition, Father relies on the fact that on October 30, 2008, the State filed the necessary petition to commence child welfare proceedings, *see* Utah Code Ann. § 78A-6-304(1) (2008) (outlining procedure for commencing neglect, abuse, or dependency proceedings in juvenile court); that the State filed a Motion for Expedited Placement in Temporary

Custody, *id.* § 78A-6-106(4) (explaining when the court shall hold an expedited hearing); that the November 3 hearing was a shelter hearing, *id.* § 78A-6-306(1) (explaining when a shelter hearing shall occur); that the hearing resulted in DCFS gaining temporary custody, pending adjudication and disposition, *id.* § 78A-6-301(3) (defining "temporary custody"); *id.* § 78A-6-307(17) ("When the court orders that a child be removed from the custody of the child's parent and does not award custody and guardianship to another parent, relative, or friend under this section, the court shall order that the child be placed in the temporary custody of [DCFS], to proceed to adjudication and disposition . . . ."); and that adjudication did not occur, *id.* § 78A-6-117(1)(a) ("When a minor is found to come within the provisions of Section 78A-6-103, the court shall so adjudicate."); *id.* § 78A-6-105(3), (25) (defining "adjudication" and "neglect").

¶41 Although the court restored legal custody to Father in August 2008, as discussed above, the juvenile court did not amend the Children's status as neglected and did not surrender its jurisdiction over the family. *See generally id.* § 78A-6-103(1)(c). The neglect adjudication from October 2007, which conferred jurisdiction on the juvenile court, remained effective. The court thus retained dispositional authority over the Children and could thereafter place the Children consistent with the Juvenile Court Act, including returning the Children to DCFS's custody in November 2008.

¶42 Several circumstances in these child welfare proceedings collided to create a situation where the juvenile court retained jurisdiction over the Children even though it had restored legal custody to Father, instead of implementing a trial home placement in August 2008. Importantly, however, the court continued DCFS's protective supervision services and did not terminate its own jurisdiction. When Father then proceeded to violate the court's order and service plan during the narrow window of time in which he had regained custody, the court had continuing jurisdiction to make further decisions regarding the best interests of the Children.

¶43 In a different set of circumstances—for example, if in August 2008 the court had implemented a trial home placement for Father rather than restoring his legal custody, and Father then violated the service plan and engaged in domestic violence in front of the Children—the parties and the court would have unquestionably picked up where they left off in the child welfare proceedings, moving ahead to a change of physical custody and termination trial. Or, if Father had abided by the service plan until the court had terminated child supervision services and its jurisdiction, and only *then* had engaged in domestic violence in front of the Children, the situation would be entirely

different. In such a case, where the court has terminated its jurisdiction, the Juvenile Court Act procedures would begin anew. After taking the Children into protective custody, the State would file a petition introducing new allegations of neglect pursuant to Utah Code section 78A-6-304(1)(b). *See id.* § 78A-6-304(1)(b). The court would then hold a shelter hearing pursuant to section 78A-6-306, the result of which might be to remove the children and place them in DCFS's temporary legal custody. *See generally id.* § 78A-6-301(3) (defining "temporary custody"); *id.* § 78A-6-306 (setting forth procedures for a shelter hearing); *id.* § 78A-6-306(9)(a)(iii) (requiring the court to determine, at a shelter hearing, by a preponderance of the evidence, whether "there is a substantial risk that the child[ren would] suffer abuse or neglect if [they were] not removed from [Father's] custody"); *id.* § 78A-6-307(17) ("When the court orders that a child be removed from the custody of the child's parent and does not award custody and guardianship to another parent, relative, or friend under this section, the court shall order that the child be placed in the temporary custody of [DCFS], to proceed to adjudication and disposition and to be provided with care and services in accordance with this chapter and Title 62A, Chapter 4a, Child and Family Services."). After that, the matter would proceed to adjudication. *See generally id.* § 78A-6-311.

¶44     However, under the circumstances of this case—where Father violated the court's order and service plan, the Children's adjudicated status as neglected was unchanged and the court retained its jurisdiction, which allowed it to make dispositional decisions regarding the Children's custody—the State was only required to file a motion for change of custody seeking return of the Children to DCFS's custody, which is a simple dispositional matter within the court's continuing jurisdiction. *See id.* § 78A-6-301(1) (defining "custody" as "the custody of a minor in [DCFS] as of the date of disposition"); *id.* § 78A-6-307(6) ("Legal custody of the child is not affected by a [removal order]. In order to affect a previous court order regarding legal custody, the party must petition that court for modification of the order."). Since the Children had already been adjudicated and the court had continuing jurisdiction over them, it was also within the court's dispositional authority to "vest legal custody" of the Children in DCFS's custody without a motion from the State. *See id.* § 78A-6-117(2)(g).

¶45     The Utah Rules of Juvenile Procedure define a "disposition" as "any order of the court, after adjudication, pursuant to Section 78A-6-117." Utah R. Juv. P. 5(f). *See generally id.* R. 46-47 (explaining procedure for disposition hearings and modification of orders). A mandatory dispositional hearing occurs either at or not later than thirty days after the adjudication. *See* Utah Code Ann. § 78A-6-311 (2008) (describing adjudication

and dispositional hearings). However, the mandatory dispositional hearing pursuant to section 78A-6-311 is not the only dispositional hearing that can occur during child welfare proceedings. The court may hold dispositional hearings as it sees fit pursuant to section 78A-6-117 and the Utah Rules of Juvenile Procedure. *See generally id.* § 78A-6-117 (listing all of the dispositions a court may make); Utah R. Juv. P. 5, 46-47. In particular, "[u]pon adjudication the court may make the following dispositions by court order: . . . The court may vest legal custody of an abused, neglected, or dependent minor in [DCFS] . . . in accordance with the requirements and procedures of Title 78A, Chapter 6, Part 3, Abuse, Neglect, and Dependency Proceedings." Utah Code Ann. § 78A-6-117(2)(g); *see also id.* § 78A-6-312(1)(b) (allowing the court to make various dispositions).

¶46    It is unclear from the record what child welfare proceeding the court conducted at the November 3 hearing.[12] It is also unclear why the State filed a petition pursuant to section 78A-6-304 rather than a motion to request a dispositional hearing or to modify

---

[12]At the November 3, 2008 hearing, the court took evidence, considered the State's new allegations of neglect, and found, by *clear and convincing* evidence, that the Children had been exposed to two separate incidents of domestic violence on October 27, 2008—incidents that put the Children in danger and demonstrated Father's inability to protect them. This indicates that the court viewed the hearing as adjudicatory. *See generally* Utah Code Ann. § 78A-6-311(1) (2008) ("If, at the adjudication hearing, the court finds, by clear and convincing evidence, that the allegations contained in the petition are true, it shall conduct a dispositional hearing."). However, the court also stated that it was removing the Children and placing them in DCFS's *temporary* custody pending adjudication, which indicates that the court viewed the hearing as a shelter hearing. *See generally id.* §§ 78A-6-301(3), -306. And yet, the court based its conclusion to remove the Children on the fact that Father's "actions, omissions, or habitual action create[d] an environment that pose[d] a threat to the child's health or safety." *See id.* § 78A-6-302(1)(a)(i) (providing that the children should be placed under DCFS's *protective* custody pending a shelter hearing if the court finds, by the preponderance of the evidence, that "there is imminent danger to the physical health or safety of the child[] and . . . the child's physical health or safety may not be protected without removing the child from the custody of the child's parent or guardian"); *id.* § 78A-6-301(2) (defining "protective custody" as "the shelter of a child by [DCFS] from the time the child is removed from home until the earlier of . . . the shelter hearing[] or . . . the child's return home").

the court's previous custody order. Nevertheless, the court previously adjudicated the Children as to neglect on October 9, 2007. The court also previously held a dispositional hearing on November 1, 2007, at which it ordered DCFS to provide reunification services to Father and ordered Father to comply with the service plan.

¶47    On October 30, 2008, the State clearly indicated in its verified petition that it sought a return of custody of the Children to DCFS, and the court clearly so ordered. As such, the November 8 hearing appears to have been a nonmandatory, dispositional, evidentiary hearing that resulted in a change of custody from Father to DCFS. *See id.* § 78A-6-117(2)(g) (permitting the court to make various dispositional orders, including "vest[ing] legal custody of an abused, neglected, or dependent minor in [DCFS]"); *id.* § 78A-6-312(1)(b) (allowing the court, at a dispositional hearing, to place the children in DCFS's custody). Father had proper notice of this hearing and an opportunity to argue his position at the hearing. *See generally* Utah R. Juv. P. 46-47. We also consider it significant that Father stipulated to certain of the State's allegations in its October 30, 2008 petition and to some of the court's findings about the new domestic violence incidents. Father also stipulated to the Children's return to DCFS's temporary custody. Subsequently, Father also waived a mediation and a pretrial hearing regarding the disputed allegations from the petition. We conclude, therefore, that although the court did not clearly articulate what procedure it was following in the Juvenile Court Act, it did not violate Father's due process rights because it provided him with ample opportunity to argue and present his case to retain custody of the Children.

¶48    In sum, because the court did not terminate its jurisdiction after legal custody of the Children was returned to Father and because the court did not alter the Children's status as neglected, it was not required to restart the child welfare proceedings. The court was therefore also not required to hold a shelter hearing and readjudicate the Children as to neglect when it returned custody of the Children to DCFS. Although the parties and the court may have been confused about the nature of the hearing and although the court may have misconstrued this proceeding as either a shelter hearing or an adjudication, the court properly considered the domestic violence incidents in late October 2008 and determined that there was substantial risk that Father might endanger the Children if they remained in his custody. Based on this information, the court properly exercised its dispositional authority in returning the Children to DCFS's custody.

### 2. Reunification Services

¶49    Father argues that the court violated his due process rights by not ordering reunification services for another year because the child welfare proceedings started anew when the Children were returned to DCFS's custody in November 2008.  Father contends that the phrase, "reunification services may not exceed 12 months from the date that the minor was *initially* removed," *see* Utah Code Ann. § 78A-6-312(2)(d)(iii)(A) (emphasis added), does not actually mean the first removal, but rather any removal from the parent's legal custody.  Thus, according to Father, the fact that the Children were returned to DCFS's custody in November 2008 entitled him to another year of services from the point of this "second removal."

¶50    We agree with the juvenile court's determination that Father had already received a full year of reunification services and was not entitled to additional reunification services upon the Children's return to DCFS's custody in November 2008.  As we have already discussed, the child welfare proceedings do not start over every time a child's custody is changed.  Additionally, the juvenile court has discretion to deny reunification services.  *See* Utah Code Ann. § 78A-6-312(2)(a)(iii) (2008) ("In all cases, the minor's health, safety, and welfare shall be the court's paramount concern in determining whether reasonable efforts to reunify should be made."); *id.* § 78A-6-312(3)(a)-(b) ("Because of the state's interest in and responsibility to protect and provide permanency for minors who are abused, neglected, or dependent, the Legislature finds that a parent's interest in receiving reunification services is limited. The court *may* determine that:  (i) efforts to reunify a minor with the minor's family are not reasonable or appropriate, based on the individual circumstances; and (ii) reunification services should not be provided." (emphasis added)); *id.* § 78A-6-314(7) ("Nothing in this section may be construed to:  (a) entitle any parent to reunification services for any specified period of time; [or] (b) limit a court's ability to terminate reunification services at any time prior to a permanency hearing . . . ."); *In re N.R.*, 967 P.2d 951, 955 (Utah Ct. App. 1998) ("Reunification services are a gratuity provided to parents by the Legislature . . . .").

### 3. Permanency Hearing

¶51    Father argues that the court denied him due process by failing to grant him a mandatory permanency hearing.  *See generally* Utah Code Ann. § 78A-6-314(1)(b) ("If reunification services were not ordered at the dispositional hearing, a permanency hearing shall be held within 30 days from the date of the dispositional hearing.").

Father contends that the December 8 hearing was scheduled only on his motion for reunification services and should not be considered a permanency hearing or even a dispositional hearing. The State argues that the December 8 hearing was "for all intents and purposes, a permanency hearing."

¶52    Assuming that the State had not filed its petition for termination of Father's parental rights on December 2, 2008, because of the court's dispositional change of custody following the October 2008 incidents, the court should have held another permanency hearing to determine a final plan for the Children. *See id.* § 78A-6-314(1)(b) (obligating the court to schedule the permanency hearing within thirty days after the dispositional hearing that denies reunification services). Specifically, the court should have held the permanency hearing within thirty days, *see id.*, or should have consolidated the permanency hearing with the three-day termination trial, *see id.* § 78A-6-314(8)(a) ("Subject to Subsection (8)(b), if a petition for termination of parental rights is filed prior to the date scheduled for a permanency hearing, the court *may* consolidate the hearing on termination of parental rights with the permanency hearing." (emphasis added)).

¶53    We need not characterize the December 8 hearing as either a dispositional hearing or a permanency hearing because, as stated, the State filed its petition for termination on December 2, and on the same day, the court scheduled the termination trial.[13] Utah Code section 78A-6-314(7)(c) provides that nothing in the section pertaining to the permanency hearing and final permanency plan shall "limit or prohibit the filing of a petition for termination of parental rights by any party, or a hearing on termination of parental rights, at any time prior to a permanency hearing." *Id.* § 78A-6-314(7)(c). This provision clearly contemplates the possibility that if a termination trial is held prior to a permanency hearing and the parent's rights are terminated, then the parent may never receive a permanency hearing. We therefore

---

[13]It is difficult to say how the juvenile court perceived the December 8 hearing. On May 27, 2009, it entered an Order on Reunification, but after Father filed his rule 59 motion, the court entered an amended December 8 hearing order, over one year later, as well as amended termination trial findings discussing the December 8 hearing. In both amendments, the court sought to recharacterize the December 8 hearing as a permanency hearing.

conclude that the juvenile court did not err in failing to hold a permanency hearing after the court returned the Children to DCFS's custody.[14]

## III. Sufficient Evidence Supported the Court's Termination of Father's Parental Rights

¶54    Father also appeals from the juvenile court's denial of his rule 41(b) motion made after the State concluded its case-in-chief at the termination trial.  His argument there and on appeal is essentially a challenge to the sufficiency of the evidence supporting the termination of his parental rights, including the juvenile court's conclusion that termination was in the Children's best interests.

¶55    "When termination proceedings are initiated under the [Juvenile Court] Act, the court must make two distinct findings supported by clear and convincing evidence before a person's parental rights can be properly terminated."  *In re adoption of T.H.*, 2007 UT App 341, ¶ 11, 171 P.3d 480.  First, the juvenile court must establish the existence of any one of the grounds in section 78A-6-507(1).  *See* Utah Code Ann. § 78A-6-507(1) (2008) ("The court may terminate all parental rights with respect to a parent if the court finds any one of the [grounds enumerated in that section].").  "Second, after finding one of the enumerated grounds, the court must find that termination of parental rights serves the best interests of the child."  *In re adoption of T.H.*, 2007 UT App 341, ¶ 11 (internal quotation marks omitted); *see also* Utah Code Ann. § 78A-6-503(2) ("Wherever possible family life should be strengthened and preserved, but if a parent is found, by reason of his conduct or condition, to be unfit or incompetent based upon any of the grounds for termination described in this part, the court shall then consider the welfare and best interest of the child of paramount importance in determining whether termination of parental rights shall be ordered."); *id.* § 78A-6-506(3) (same).

---

[14]Although the court was not required to hold a permanency hearing because the State filed a petition for termination and the court ultimately held a termination trial, we note that the court certainly could have elected to hold a permanency hearing after the December 8 hearing.  Nonetheless, this was certainly not a case where the permanency goal of termination was a surprise to Father or where an articulation by the court of that course could have resulted in a different outcome for Father.  On December 2, the court scheduled the termination trial.  On December 8, the court denied reunification services, at which time Father indicated that he "just want[ed] to go straight to trial."

A. Grounds for Termination

¶56 Father challenges the sufficiency of the evidence for each ground on which the juvenile court based its decision to terminate his parental rights: Father's neglect, *see* Utah Code Ann. § 78A-6-507(1)(b); Father's unfitness or incompetency, *see id.* § 78A-6-507(1)(c); the Children's out-of-home placement with a substantial likelihood that Father would not remedy the circumstances causing the Children to be placed out-of-home and that Father "[would] not be capable of exercising proper and effective parental care in the near future," *see id.* § 78A-6-507(1)(d)(i)-(iii); and Father's failure to adjust parentally, *see id.* § 78A-6-507(1)(e). Father claims that the juvenile court failed to appropriately weigh Father's reinstated custody in August 2008 after he successfully completed the service plan, Father's positive visits with the Children after they were returned to DCFS's custody the second time, Mother's previous attempts to sabotage Father's successful relationship with the Children, the absence of domestic violence in the three months preceding the trial, and Father's recently stabilized relationship with Mother.

¶57 Because the juvenile court "is in an advantaged position with respect to the parties and the witnesses" and because the juvenile court's decisions "rely heavily on the juvenile court's assessment and weighing of the facts," we "afford[ its decision] . . . a high degree of deference." *In re B.R.*, 2007 UT 82, ¶ 12, 171 P.3d 435 (internal quotation marks omitted). Accordingly, "[w]hen a foundation for the court's decision exists in the evidence, [we] may not engage in a reweighing of the evidence." *Id.* "Thus, in order to overturn the juvenile court's decision the result must be against the clear weight of the evidence or leave the appellate court with a firm and definite conviction that a mistake has been made." *Id.* (internal quotation marks omitted).

¶58 The court found that Father failed to recognize Mother's mental health issues and the negative effects they have on the Children, including causing instability and volatility throughout this case; that Father chose to stay with Mother in spite of her failure to comply with the DCFS service plan; that in 2008, eight separate and severe domestic violence incidents requiring police involvement occurred between Father and Mother; and that Father continued to engage in contact with Mother in spite of the no-contact order and in spite of the negative effect the domestic violence incidents had on the Children. The court found that Father chose his wife over the Children, as indicated by the violent contact between Father and Mother in late October 2008, by the contact between Father and Mother following the November 3 hearing where the court had ordered the parents to avoid contact with each other, and by Father's Motion To Lift or

Modify the No Contact Order. Specifically, the court stated, "[T]he parents have made recent efforts to address their issues," but "[any] progress and commitment is too little too late." The court emphasized that although Father had committed to protecting the Children and placing them first when custody was returned to him in August 2008, he failed to do so. "[T]he pattern of inappropriate behavior, stress, instability, and mental health issues since Day 1 of this case continues." The court concluded that the "history of violent behavior" throughout the eighteen months of proceedings supported its determination that Father was unfit and had neglected the Children. *See* Utah Code Ann. § 78A-6-508(2)(f) ("In determining whether a parent . . . [is] unfit or [has] neglected a child the court shall consider, but is not limited to, . . . a history of violent behavior.").

¶59   Rather than challenging these findings, Father urges us to reweigh the evidence, which we will not do. *See In re B.R.*, 2007 UT 82, ¶ 12. The court recognized Father's evidence of improvements and nonetheless determined that the other evidence of his neglect outweighed any progress he had made. We conclude that the juvenile court considered all of the facts Father disputes and that its decision was not against the clear weight of the evidence. Thus, we conclude that the evidence sufficiently supports the juvenile court's termination of Father's parental rights based upon Father's neglect and unfitness or incompetency. *See* Utah Code Ann. § 78A-6-507(1)(b) (neglect); *id.* § 78A-6-507(1)(c) (unfit or incompetent); *see also In re V.L*, 2008 UT App 88, ¶ 22, 182 P.3d 395 (affirming juvenile court's conclusion that the father was unfit or incompetent because he was "unwilling to end his relationship with [the m]other, who has been determined to be an unfit parent" and was "unable to or unwilling to prevent contact between [the m]other and the children"); *In re T.M.*, 2006 UT App 435, ¶ 18, 147 P.3d 529 (affirming juvenile court's termination of the father's parental rights due to his "unwillingness to give up his ongoing relationship with [the m]other," which "prevent[ed] him from being an adequate father and endanger[ed] the children" and due to his insistence on choosing his relationship with the mother over his children). Because the evidence was sufficient to support termination of Father's parental rights on these grounds, we do not address the other grounds on which the court based its termination of Father's parental rights, *see* Utah Code Ann. § 78A-6-507(1) (stating that "[t]he court may terminate all parental rights" if it finds any one of the grounds listed in section 78A-6-507(1)).

B. Best Interests of the Children

¶60   Finally, Father argues that insufficient evidence supported the juvenile court's determination that termination of his parental rights was in the Children's best

interests.[15]  The State must prove its allegations supporting termination by clear and convincing evidence.  *See In re adoption of T.H.*, 2007 UT App 341, ¶ 11, 171 P.3d 480.  The court found that over the last eighteen months of proceedings, "the [C]hildren have needed the parents to focus on them and provide a safe home, which the parents have failed to do. . . .  These [C]hildren need stability and a sense of permanency."  The court also weighed Father's initial accomplishments in having custody restored to him in August 2008, against his failure to keep his commitment to the court to avoid contact with Mother:  "[F]ather failed to protect and willfully violated th[e c]ourt's order a mere 12 weeks later. . . .  [F]ather willfully imposed his ideas over what, in fact, was safe for the [C]hildren and over the specific needs of the [C]hildren to be protected."  Additionally, the court found that "the [C]hildren are treated as members of the family" in the foster home.  "These [C]hildren deserve stability and to have the moving from one home to another eliminated.  The [C]hildren deserve a loving, safe and appropriate family, which they have found in the foster home."  The court found that the Children now recognize their foster parents as their mother and father.

¶61    In spite of these findings, Father specifically challenges the court's rejection of the testimony of his and Mother's marriage therapist that it was in the Children's best interests to remain in custody with Father.  The court gave little weight to the marriage therapist's opinion because she had not conducted counseling with the Children, or with the Children and Father, and she had not conducted any bonding assessment of

---

[15]Father actually appeals the juvenile court's denial of his motion for a directed verdict, in which he asserted that the State failed to show by clear and convincing evidence that termination was in the Children's best interests.  "When reviewing the denial of a motion for [a directed verdict], an appellate court should defer to the trial court's findings and inferences under a clearly erroneous standard and review the trial court's conclusions of law for correctness."  *Markham v. Bradley*, 2007 UT App 379, ¶ 13, 173 P.3d 865.  Because Father challenges the sufficiency of the evidence supporting the juvenile court's best interests determination, our review is under the same clearly erroneous standard.  *See In re S.L.*, 1999 UT App 390, ¶ 20, 995 P.2d 17 ("The clearly erroneous standard requires that if the findings . . . are against the clear weight of the evidence, or if the appellate court otherwise reaches a definite and firm conviction that a mistake has been made, the findings . . . will be set aside." (omissions in original) (internal quotation marks omitted)).

the Children with Father. Although Father points to other witnesses' testimonies that may have supported a different conclusion, the court acted within its discretion in assigning less weight to the testimonies, and we will not reweigh the evidence. *See In re B.R.*, 2007 UT 82, ¶ 12.

¶62    Based upon the factual findings, the juvenile court appropriately considered "the physical, mental, or emotional condition and needs of the child[ren]," *see* Utah Code Ann. § 78A-6-509(1)(a) (2008), along with Father's efforts to adjust his "circumstances, conduct, or conditions to make it in the children's best interest to return . . . to his home," *see id.* § 78A-6-509(1)(b). The juvenile court's termination of Father's parental rights was supported by the clear weight of the evidence. Father may have initially demonstrated his desire to change his conduct, which prompted the juvenile court to restore his custody in August 2008, but his improvement was short-lived, and he relapsed into the same conduct that prompted the Children's removal in August 2007. After the Children were returned to DCFS's custody the second time, Father failed to abide by the court's rulings and accept the condition that he simply could not have contact with Mother if he was to keep the Children in a safe and stable environment. Given the Children's stable environment with their foster family and Father's inability to provide a stable environment, we conclude that the juvenile court did not err in determining that it was in the Children's best interests to terminate Father's parental rights, and we therefore affirm its decision.


CONCLUSION

¶63    Although the juvenile court permanently restored legal custody to Father, it retained jurisdiction and dispositional authority over the Children. When the Children were returned to DCFS's custody only a few months later in November 2008, the juvenile court did not need to adjudicate the Children again. The clock did not start over for additional reunification services. Father received the due process to which he was entitled. These proceedings presented a unique situation to the parties and to the court. Ultimately, because the court had jurisdiction over the Children in November 2008, the proceedings essentially resumed, ensuring the Juvenile Court Act's policy that the Children would not "be placed in a 'legal limbo' for an unwarranted time period." *See In re S.C.*, 1999 UT App 251, ¶ 10, 987 P.2d 611 (citation omitted). We also cannot say that the juvenile court's determinations that Father neglected the Children and was

unfit and that termination was in the Children's best interests was against the clear weight of the evidence.

¶64    Affirmed.


_____

Michele M. Christiansen, Judge

-----

¶65    WE CONCUR:


_____

Gregory K. Orme, Judge


_____

Stephen L. Roth, Judge